J. OLIVER TILLEY *vs.* HERMAN L. JOHNSON.

Penobscot: Opinion January 13, 1931.

*C. J. O'Leary*,
*George E. Thompson*, for plaintiff.
*George F. Eaton*, for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRING-
TON, THAXTER, JJ.

BARNES, J.  This case, an action for damages for injuries to the
person of a pedestrian crossing the mouth of a street, and alleged
to have been caused by defendant's Ford runabout, driven by de-
fendant and striking plaintiff, comes up on appeal from a verdict
awarding $4,250 as the damages, on the general motion that the
verdict is against law, against evidence and the weight of evidence,
and that the damages are excessive.

At the time of the accident the margin of Main Street at the
mouth of Broad, the strip that pedestrians traverse in passing
along Main Street, differed in no respect from the street surface on
either hand. The surface of the crosswalk, so-called, was of con-
crete, and like the surface of the streets adjacent. The distance to
be covered in crossing the mouth of Broad Street is a few inches
more than 132 feet.

The accident occurred between 5 and 6 o'clock in the afternoon
of October 17, 1929, in the mouth of Broad Street, City of Bangor.

An ordinance then and there in force reads, "Every driver ap-
proaching an intersection, crosswalk, corner or curve, not pro-
tected by a signal system or police officer, shall sound a signal in
such a way as to give warning to other vehicles and pedestrians of
his approach"; and it is admitted that this intersection was not
then protected by a signal service system nor a police officer.

At the time of the accident visibility was lessened by the ap-
proach of night, and by precipitation variously termed, "a slight

rain," "raining a little," "misty," "just a little fine mist," "misting a little, kind of lowery."

Plaintiff was a barber, forty-seven years of age. He testified he left his place of employment at twenty minutes after five, reached Sweet's corner, the upper corner of Broad and Main Streets, and started on the crosswalk to cross the mouth of Broad Street at about five-thirty; that when he started over the crosswalk he did not notice any automobile approaching; that when he was "about three-quarters of the way across," without hearing any sound of horn or other signal he was hit and rendered unconscious.

A witness testified he came down Main Street to Sweet's corner, stepped off the sidewalk onto the crossing from six to ten feet behind plaintiff and followed him until plaintiff had passed over half or three-quarters the length of the crosswalk, when the witness saw a car, which proved to be that of defendant, enter Broad Street from Main; heard a crash and saw what looked like a bag of potatoes roll from the right front fender of the car, along its running-board and along Broad Street till it stopped, and he found it was the plaintiff, unconscious but moaning.

Defendant testified that he did not "have any difficulty in seeing the objects in front," as he made the crossing, that he "Never saw a thing" in his way, and that he felt no jar or shock, but a "rub," as of "two automobile tops that would be rubbing by each other."

It must have been the contention of defendant that his car did not come in contact with plaintiff, as evidenced by the following question and his answer.

Q. "Well, Mr. Johnson, from the testimony you have heard to-day, aren't you satisfied in your own mind that you did run against or over Mr. Tilley that day and injure him, or that your car did?"

A. "No, Sir."

Again, when asked why he didn't see plaintiff and the witness who testified to following plaintiff to the place of the accident, defendant replied:

"They wasn't in my vision on the crosswalk in the course I was taking."

From the testimony we conclude that no other vehicle was in the immediate vicinity at the time, save a taxicab near Sweet's curb,

and a truck that arrived just before or just after the accident and stood near another curb of the wide street.

There is as expected, a great variance in estimates of defendant's driving, from 14 to 25 miles per hour; but it is not controverted that he made the turn into Broad Street at or to his left of its median line.

Decision as to the care exercised by plaintiff and defendant respectively was for the jury.

As to many details there is differing testimony in the record, but we assent to the jury's decision that defendant caused the injuries complained of and negligently caused them, while plaintiff was in the exercise of due care.

It seems equally clear that the damages are excessive.

As to the just and appropriate amount of damages recoverable its determination is difficult.

"For the law court to assess damages in this class of cases without seeing and hearing the parties and their witnesses, is a difficult task." *House* v. *Ryder*, 129 Me., 135, 150 A., 487.

Except for a condition of one leg, which plaintiff terms "nervous," troubling him some at night, at the time of trial, his injuries seem to have been superficial.

His head was covered with bruises and abrasions, his right ear appearing to one of the surgeons who attended him "ground to bits."

The upper portion of that ear is gone, and the mutilation is permanent and disfiguring.

Granted that he ached in every limb and muscle for a time, his recovery, at time of trial, except for the disfigurement, seems to have been very complete.

The monetary loss, from sixteen weeks of enforced idleness and all charges presented for aid and treatment during seven weeks in hospital and for some time thereafter, amounts to $838.92.

To compute compensation for pain and suffering is a perplexing problem. It was, however, the duty of the jury. Dispassionately done, under the rule that the injured suitor is entitled to compensation within reasonable limits only, it is our opinion that compensation should have been not more than $2,500.

So that, if remittitur of the excess above that sum is entered, judgment may be had for $2,500; otherwise new trial upon the question of damages only.

*So ordered.*