EDITH HOUSE *vs.* GEORGE RYDER.

Knox.     Opinion May 20, 1930.

136

*Oscar H. Emery*, for plaintiff.
*Charles T. Smalley*, for defendant.

Sitting: Pattangall, C. J., Dunn, Sturgis, Barnes, Farrington, JJ. Philbrook, A. R. J.

Philbrook, A. R. J. This case is before us on report. The record contains the customary stipulation that questions of law are involved of sufficient importance and doubt to warrant the case being sent forward to the law court on report, and the parties having agreed thereto, the case is reported upon so much of the evidence as is legally admissible, the law court to determine liability and to assess damages if the plaintiff is entitled to a verdict. The case arises from an automobile accident wherein the plaintiff, a pedestrian on a public way, was struck by an automobile driven by the defendant. There are no legal questions involved which have not been fully settled by numerous decisions. For the law court to

assess damages in this class of cases, without seeing and hearing the parties and their witnesses, is a difficult task. It would have been more satisfactory to have had the case submitted to a jury under proper instructions, which the judge presiding at the trial below was amply qualified to give. There are precedents for reporting a case like the one at bar, and we willingly undertake the performance of our task, although it may be properly hoped that in the future such reported cases may gradually become more rare.

On the nineteenth day of November, 1929, soon after eight o'clock in the evening, the plaintiff was a passenger on an electric street car running from Rockland to Thomaston. Near Thomaston is a hospital, operated by Dr. Everett W. Hodgkins, whose wife has been a friend of the plaintiff since their girlhood. The street upon which the electric car is operated passes the hospital. The plaintiff, for the purpose of a social call on Mrs. Hodgkins, took the electric car at Rockland. As the car approached the hospital she signalled the motorman to stop but before that had been accomplished the car had passed a short distance beyond her intended destination. The plaintiff alighted and after the car had started, realizing that she was some distance from the hospital, walked back as the car moved along. Her testimony is: "I stepped in the car tracks and I thought I was perfectly safe, and I looked toward Rockland first and I saw no car in sight, and as I looked toward Thomaston village the lights of a car came up in front of me, and I put my head down, they blinded me so, and apparently it seemed so near, and the thought flashed through my mind that that car was coming quite close to me, but I didn't think it would hit me, and that was the last I knew until I was in Dr. Hodgkin's office." In response to questions proposed by her attorney she insisted that she was standing on the railroad track when she first saw the automobile approaching, that as to being in or out of the track from that time until she was struck by the automobile, her position was the same, in brief that when she came around the rear end of the street car she got on the car track and stayed there. In cross examination she insisted that she was between the rails of the electric car track at the moment of collision, but was nearer the rail toward Dr. Hodgkin's house. No eye witness of the accident was

called to substantiate the testimony of the plaintiff nor does the record disclose the existence of any such.

The defendant's testimony as to the collision is, substantially, that he first saw the trolley car headlight when he was leaving the busy section of Thomaston, that the highway is straight, that he did not know how far down the street the trolley car was located when he first saw its light, that he could not tell at that moment whether it was in motion or had stopped "on account of the glare," that he had passed about two car lengths from the glare before he saw somebody in the road, that his vision was not obstructed after he passed from the glare, that the concrete surface of the street on either side of the trolley track was about twelve feet in width and that he was in the middle of that part of the concrete which was between the trolley track and the Hodgkins hospital. He testified that the plaintiff was "just about one step out on the cement road" when he first saw her, and also testified "as soon as she see me she put her hand up to her head like this (indicating) and stooped right down and struck the front end of my mudguard." The testimony of the defendant, likewise, had no corroboration from an eyewitness. When the defendant had stopped his automobile and gone to the aid of the prostrate plaintiff he found that she was being assisted to rise by a man, who departed as soon as the plaintiff was within the hospital but as to the identity of that man the defendant had no knowledge nor of his whereabouts at the time of the trial. The defendant testified that when plaintiff's hand bag was picked up its contents fell out and, to quote his own words, "They were right in the car track, or not the car track but the auto's track, behind the car."

The officer who served the writ was asked whether, at that time, the defendant made some explanation as to the cause of the accident and where the plaintiff was when she was struck. In answer he said, "The night I served the paper on him he was talking with you (plaintiff's counsel) about the case and said that the lights blinded him on the car, on the electric car, and he never saw the woman until the car hit her; and afterwards in the conversation, I don't remember whether it was a direct question you asked him or not, but he stated that he thought she was about one pace from

the car track, out of the car track, stepped out of the car track."

Taking into account all the testimony in the record, and giving it interpretation most favorable to the defendant, we think a jury would be justified in finding, first, that the defendant was blinded by the headlight of the electric car, and, second, that he was driving too near that car when the accident occurred.

In a case recently decided by this court, *Cole* v. *Wilson*, 127 Me., 316, where an automobile driver, encountering glaring lights of another motor vehicle on a foggy night, struck and injured a pedestrian, it was held that the jury was justified in finding the driver guilty of negligence in not stopping his car. Citing abundant authorities this court held that the driver of an automobile, encountering a heavy fog while on his way home, may proceed at a reasonable speed and is not obliged to stop and wait for the fog to lift in order to escape a charge of negligence. He must, however, exercise a degree of care consistent with the existing conditions, but "if the operator of a machine is blinded by the light from another vehicle so that he is unable to distinguish an object in front, reasonable care requires that he bring his vehicle to a stop, and a failure to do so justifies a charge of negligence."

No man is entitled to operate an automobile through a public street blindfolded. When his vision is temporarily destroyed by a glaring light it is his duty to stop his car. *Hammond* v. *Morrison*, 100 Atl., 154.

The care to be exercised by him who drives an automobile upon the public streets must be commensurate with the danger to be avoided. *Savoy* v. *McLeod*, 111 Me., 235. It is common knowledge that when, in the night time, an automobile approaches a street car, both having bright headlights, a condition arises which is fraught with danger to pedestrians lawfully upon the street and may be doubly so to passengers alighting from the street car. The degree of care required by law in such circumstances must be commensurate with the existing danger.

The law requires increased care on the part of the motorist in meeting or passing a street car which has stopped to take in or land passengers. Not only must he expect passengers on the side of the car from which they alight, but he must anticipate that some

passengers may pass behind the car to the other side. *Day* v. *Cunningham*, 125 Me., 328. If the motorist seeks to avoid the charge of negligence on the ground that he is unable to know whether the street car has stopped to accommodate passengers, because of the glare of the light on the street car, or for other reasons, the reply is that he must not recklessly proceed upon his way under circumstances of doubt, he must know or, failing to know, should bring his car to a stop as in cases where his vision is blinded by a glare.

As already indicated we also think a jury might properly find that the defendant was negligent in driving too near the street car which he was about to meet. According to the plaintiff's testimony she was between the rails when struck; the defendant could only place her "just about one step out on the cement road." The accident could not have happened unless the defendant was driving unnecessarily near the electric car. The twelve foot cement way gave him ample room to meet the electric car at a safe distance therefrom and this he should have done. We hold that the plaintiff has sustained the burden of proving defendant's negligence. The record also clearly shows that no failure of the plaintiff to use due and ordinary care contributed to the accident.

For the purpose of determining the measure of damages the plaintiff offers her own testimony, together with that of a sympathetic husband and daughter, the testimony of Dr. Hodgkins and of Dr. Scarlott, the latter an osteopathic physician, whose professional treatment began December 27 and was continuing at the time of the trial. The defendant offers the testimony of Dr. Neil A. Fogg. An extended discussion of all this evidence would be of interest only to the parties. She, and the members of her family, say that her weight has diminished, that she is unable to work as she did before the accident, that she has suffered mental disturbance, physical pain in her limbs and in the back of her neck, and from disfiguration of her nose and lip.

Dr. Hodgkins, the first one to render professional treatment, testified as to her bruises and abrasions, particularly one which extended from the base of the nose directly through the entire lip, and a severe cut on the bridge of the nose. These conditions re-

ceived proper attention. The wound on nose and lip were sutured, but, said the doctor, this would necessarily leave scar tissue, or a bluish disfiguration. When she was removed from the hospital to her home, on November 25, six days after the accident, the doctor said, "Her physical condition was very good, except her nervous condition and hysteria. Her physical condition was as good as you could expect under a traumatic injury." At the time of the trial, February, 1930, the doctor was requested to examine the plaintiff's upper lip and nose and state whether or not, in his opinion, the marked disfiguration would ever clear itself, to which he replied, "That is a pretty hard question to answer." He also testified that "Scar tissue of course bleaches more or less, but there will always be in her lip here, and in the nose, there will always be scar tissue." In cross examination he said the injuries were not serious, as far as prognosis was concerned, and that as time goes on she would get over her nervousness; that as to the scar tissue disfiguration it will be less noticeable in time but that it would take several years for it to become white. In redirect he said she would always suffer from disfigurement.

Dr. Scarlott testified that he was treating the plaintiff twice a week for an injury to her knee, an injury or strain of the back, and her nervous condition, and that it "will take her some length of time to recover." He thought the scars would be permanent but would bleach out in time and not be so noticeable.

Dr. Fogg, at the request of counsel on each side of the case, examined the plaintiff on December 17, practically one month after the accident occurred. His statement was, "The right side of her forehead was quite prominent and slightly discolored, and in examining that area it was thickened and tender. There was a depressed bluish scar on the nose which seemed to be adhered to the nasal bone, especially in the midline. The upper lip at about the middle point had rather a bad scar which was depressed with thickening on the outside. The line between the true skin at the junction of the lip was irregular and unsightly. The right knee was slightly larger than the left knee, and there was a clicking present when the leg was extended and flexed. The calf was also swollen and

142

tender and rather hard. There was a recent scar on the inside of the left leg. I think that is all the abnormalities I found."

With reference to the lip he testified that it might be improved by surgery and that in time some of the discoloration would disappear. Taking her injuries as a whole, he did not regard them as severe. In cross examination, answering persistent efforts by plaintiff's counsel to have him state that her injuries were severe, he said at least seven times that her injuries were not severe, from his understanding as to what constituted a severe accident, and that, excepting the scar on her lip and nose, within six months from the date of her injury she would be in as good shape as she was before it occurred. He thought by surgical treatment the scar could be fixed so that there would be only slight traces of it, and that without surgical care time would sufficiently remove the scar tissue so that it would look a lot better than it did at the time of the trial.

From this resumé of the testimony and from a careful study of all the record we think just compensation would warrant an assessment of damages in the sum of twelve hundred fifty dollars ($1,250.00).

> *The mandate will be, therefore, Judgment for the plaintiff in the sum of $1,250.00, with taxable costs.*