JACOB BRENNING, APPELLANT, V. E. B. REMINGTON, APPELLEE.

287 N. W. 776

FILED OCTOBER 6, 1939. No. 30602.

*Fred T. Hanson* and *Cordeal, Colfer & Russell*, for appellant.

*Butler, James & McCarl, Donald E. Kelley* and *Kern & Faville*, contra.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

EBERLY, J.

This is an action to recover damages for personal injuries sustained by plaintiff when he was struck by defendant's automobile on October 7, 1936. At the close of plaintiff's evidence in chief, the trial court sustained defendant's motion for a judgment in his behalf, "the court being of the opinion that the evidence shows, as a matter of law, there was negligence on the part of the plaintiff that was more than slight as compared to the negligence of the defendant." From the order of the trial court, plaintiff appeals.

Under the circumstances presented by this record we are committed to the principle, viz.: "In reviewing the discharge of the jury and the entry of a nonsuit at the close of plaintiff's evidence in an action for negligence well pleaded, the appellate court will consider as established every pertinent fact which the admissible evidence adduced proves or tends to prove and give plaintiff the benefit of proper inferences therefrom." *Andrews v. Clapper*, 133 Neb. 110, 274 N. W. 209.

The sole question is whether plaintiff is chargeable with contributory negligence sufficient to defeat his action. Apart from the defense of contributory negligence, actionable negligence on part of defendant is unquestioned.

The accident occurred on Third Street West in the city of McCook, Nebraska, at a point opposite the German Congregational Church, and on the west side of that street. It appears that U. S. Highway No. 183 is located thereon. This is a straight, paved street, 80 feet in width between lot line and lot line. The paved portion thereof is 33 feet, 6 inches between east and west curb lines, with a slope from north to south. There is nothing in the record which would support the inference that this paving was wet, slippery, or icy on the night in question. There was a street light in the north intersection of this street approximately 150 feet from plaintiff's car. There were electric lights over the basement door of the church, and there were electric porch lights on residences facing this street on the west side thereof, and these lights "shined out on the road." There is no affirmative evidence in the record indicating the presence of mist, sleet, fog, ice, or snow which might adversely affect the automobile lights or impair the visibility created thereby. On the night of the accident, plaintiff, a married man, 51 years of age, who was then, and had been, employed by the Chicago, B. & Q. shops as a machinist, was going to the church to attend prayer meeting. About 7:30 p. m. he drove down Third Street West from the north and parked his car opposite the church, parallel to and "about six inches from the west curb" thereof. This car was five feet, eight inches in width. The following excerpts from plaintiff's direct examination, cross-examination, and redirect examination, mirror the facts of the transaction, viz.:

"Q. It is true, is it not, Mr. Brenning, that the members of that church are accustomed to park their cars at the curb on both the east and west sides of Third Street West near the curb? A. Yes. Q. And you have seen that done many times? A. Yes. * * * Q. Now, you parked your car, as I understood your testimony, about six inches from the curb, or close to it? A. Yes, sir. Q. Then you switched off the motor? A. Yes, sir. Q. Then you got out of your car? A. Turned off the lights. Q. You turned off your lights after switching off your motor? A. Yes. Q. Then

you got out of the car, did you not? A. Yes, sir. Q. Then you reached in for two hymn books? A. I did. Q. After you got your hymn books out of your car you shut the door? A. Yes, sir. Q. And then you turned around and looked north? A. Yes, sir. Q. You saw a car approaching from the north with its lights on? A. Yes, sir. Q. The car was in approximately the middle of the street? A. Yes, sir."

(From direct examination) "Q. How far away was the car, if you know? A. Oh, I should judge about a block."

(From cross-examination) "Q. When was it, Mr. Brenning, that you observed the cars parked across the street on the opposite side? A. When I drove out there. Q. Was there any other car parked on the west side of the street where you parked your car? A. No. * * * Q. And I believe you said, did you not, Mr. Brenning, that this second car, the one farthest south, was just opposite you in the street; wasn't it just south of this cement platform? A. Pretty close. Q. So that they were just opposite each other across the street? A. A little bit down below the church, that other fellow was. Q. You saw that when you drove up and parked your car, did you not? A. Yes, sir. * * * Q. After you got out of the car, did you observe the two cars parked across the street? A. Yes, sir. Q. After you saw this car approaching from the north you turned around and looked south? A. Yes, sir."

(From direct examination) "Q. At that time and place were you able to observe or do you know the speed of that approaching car (from the north)? A. No."

(From cross-examination) "Q. And I believe you said that you saw a car approaching from the south just entering the block, is that right? A. Yes, sir. Q. And its lights were burning? A. Yes, sir. Q. Now, I believe you told Mr. Colfer that you thought it was going about twenty-five miles an hour? A. That is my thought. * * * Q. Where was that car from the south moving; on what side of the street? A. On the east and right-hand side of the street. Q. On the east and right-hand side of the street? A. Yes, sir. Q. Now, I want to call your attention to this plat—

Just a minute, Mr. Brenning,—the German Congregational Church is shown on this plat as being located on three feet of lot nine and about forty-seven feet of lot ten of block six, Original Town, which is 505 and 507; is that about the correct location? A. Yes; about the center. Q. Just about the center of the block, is it not? A. Yes. * * * Q. And there was a car directly across the street from you to the east? A. Yes, sir. * * * Q. As you turned around and faced south and saw this car approaching from the south, you stood beside your car with your hand on the handle of the car, did you not? A. I did; yes, sir. Q. And you continued to stand with your hand on the handle of the door of that car until you were struck? A. Yes, sir. Q. Now, you were facing directly south or southeast, were you? A. Yes, sir. Q. Did you at any time turn around again and look north? A. No, sir. Q. Now, Mr. Brenning, when you got out of your car on the left-hand side of the street did you intend to walk across the street to the church? A. After the streets were cleared; yes. Q. You intended to go directly across the street to the church? A. Sure. * * * Q. Was there anything to prevent you from alighting from your car at the—from the car on the right, instead of getting out in the street? A. No. * * * Q. And you continued to stand facing south with your hand on the handle of the door until you were struck? A. I did."

(From redirect examination) "Q. One more minute— About what length of time elapsed between the time you saw the south-bound car and the time you were hit? A. Just about four or five seconds."

(From direct examination) "Q. Did you hear a warning of any horn given by the south-bound car? A. Not a thing. Q. Do you remember whether the lights shone on you or any—(interrupted). A. Yes, the lights were shining. Q. Did you hear any sound—any sort of sound at or before he struck you? A. Not a thing."

Another witness testified that the defendant's automobile, then coming from the north, was coming pretty fast, about 40 miles an hour.

Also, relating to the question of speed is the following evidence (from testimony of witness Weber), viz.:

"Q. Did you make any measurements of those tracks with reference to the west curb of Third Street West? A. I did. Q. And at what point did you start to make these measurements? A. I would like to remark there were two different kinds of tracks; I only measured the dark, black tracks. I measured them at their extremities, the north point and the south point. Q. What did you find those measurements to be? A. At the north point, I found them to be six feet, six inches from the base of the curb; at the southern point, I found them to be six feet and four inches from the bottom of the curb. Q. Are you now referring to the west, or right-hand track? A. The track nearest to the curb. Q. Did you make any examination of these tracks in a lineal distance? A. Yes, sir. Q. And what measurements did you find with reference to those? A. I found them to be forty-one and a half feet long. Q. What was the character of the tracks which you observed and measured? A. They were a dark black track, where no tread of any kind of the tire was visible. Q. Did you make any further examination as to any other tracks north of where you found the black tracks? A. I observed that in direct line with those black tracks these lighter tracks extended farther north. Q. How far north? A. I made no measurements of them, but I would say at least twenty or thirty feet. Q. North of the black tracks? A. Of the black tracks. Q. Was there any indication of a tire smear on the pavement beyond the darker tracks, which were forty-one feet long? A. Certainly."

Also (from testimony of witness Reinek): "Q. Tell the court and jury what you did there, what you found. A. Well, when I come out of the house in the morning, I see that black stripe where the wheels slid; I study it strong, look that way; I figure how long is that and how wide; I put my long rule out and measure forty-one feet long way; I take my rule this way, I measure just about in the middle, just about seven feet. Q. from the west curb? A. Yes;

on the first black mark about seven feet; I just measured in the middle. Q. Then the tracks were forty-one feet long? A. Yes. Q. And the west track was about seven feet from the curb, is that correct? A. Yes. Q. What kind of tracks were these, Henry? A. Real black ones, real black ones. Q. Could you see any traces of rubber on the—(interrupted). A. Yes; real black; must have had awful good brakes, set them so hard."

In addition, there seems to be no contention but that the car from the north and the one from the south passed each other at a point substantially opposite the place where plaintiff's car was parked.

In consideration of the testimony quoted, it is to be remembered that "the primary and paramount object in establishing and maintaining streets and highways is for the purpose of public travel, and the public and individuals cannot be rightfully deprived of such use." 13 R. C. L. 251, sec. 208.

And also, as an incident to such lawful use, travelers, within reason, may stop temporarily upon such highways. 29 C. J. 648.

The introduction and general use of the automobile did not *ipso facto* deprive the traveler of his ancient rights upon the public highways. The characteristics of the newer methods of transportation may have indeed suggested the adoption of reasonable regulations for the benefit of all who travel or are transported. But the ancient rights of those who travel were modified by legislation only to the extent that the language employed by the legislature expressly directed or necessarily implied. The characteristics of the modern automobile clearly manifested the necessity of regulation of traffic where there was an intersection or crossing of lanes of travel, such as are found at road and street intersections. To meet this situation we find a general adoption of ordinances, such as the McCook ordinance here presented, and the statutory provisions referred to in the briefs herein filed.

Our section 39-1148, Comp. St. Supp. 1937, provides, in part:

"(c) The driver of any vehicle upon a highway within a business or residence district shall yield the right of way to a pedestrian crossing such highway within any clearly marked crosswalk or any regular pedestrian crossing included in the prolongation of the lateral boundary line of the adjacent sidewalk at the end of a block, except at intersections where the movement of traffic is being regulated by traffic officers or traffic direction devices. Every pedestrian crossing a highway within a business or residence district at any point other than a pedestrian crossing, crosswalk or intersection shall yield the right of way to vehicles upon the highway."

It will be noted that neither ordinance nor statute has application to a pedestrian except when in the act of crossing the highway. It is equally obvious that the many cases cited by counsel pertaining to accidents occurring while crossing highways afford no help in view of the issues in the present case.

Thus in *Doan v. Hoppe,* 133 Neb. 767, 277 N. W. 64, the defendant's car struck and injured plaintiff while the latter was in the act of crossing the city street of Lincoln between intersections, in direct violation of the city ordinance involved. In the instant case the act of crossing the street by Brenning had not yet commenced at the time he was struck by defendant's car, and no violation of the city ordinance or the statute had then occurred. This constitutes the essential difference between the two cases, and renders the principle of law announced in the *Hoppe* case inapplicable to the present one.

But, even if the terms of the statute were applicable to the present situation, it will be noted that the statute does not forbid pedestrians from crossing between intersections, but only gives a superior right of way to the vehicle drivers, and a pedestrian is not necessarily negligent in attempting the crossing. Such statute bears only on the degree of care to be taken by the pedestrian.

These statutes and ordinances, limited by the language in which enacted, apply only to the act of the pedestrian in

crossing the streets of the city or the public highways of the state. They in no manner and in no degree otherwise affect the traveler's traditional right to use the public way and all parts thereof including his right of longitudinal travel thereon.

Thus, "A pedestrian, in walking along the traveled part of the highway, may assume that automobiles approaching from the rear will exercise ordinary care in keeping a lookout for him, especially if walking along the extreme right-hand edge of the paved roadway, and it is not as a matter of law his duty to turn about constantly and repeatedly or at any stated intervals of either time or space to observe the approach of vehicles from the rear. So his failure to turn and look back while walking in the street of itself is not sufficient to convict him of negligence contributing to his injuries when struck." 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) sec. 1414.

Nebraska has fully adopted the principles just set forth as to the right of longitudinal travel. *Cotten v. Stolley*, 124 Neb. 855, 248 N. W. 384. In the *Cotten* case, in an opinion by Day, J., there is this statement, viz.:

"It was immaterial whether Alta Cotten was walking on the graveled shoulder of the highway or upon the pavement (when she was struck and injured by an automobile coming from behind), as a pedestrian had a right to walk in a street or highway, and, in so doing, was not as a matter of law guilty of contributory negligence."

The controlling principles of this *Cotten* case, as announced in the opinion, are, viz.:

"Pedestrian has right to walk longitudinally in highway, unless forbidden by statute, and is not, as a matter of law, guilty of contributory negligence in so doing.

"Pedestrian lawfully on highway may rely on reasonable care of automobile drivers, and is not negligent, as a matter of law, in failing to anticipate driver's negligence."

See, also, *Carlson v. Roberts*, 133 Neb. 166, 274 N. W. 473.

It being conceded that a person may be lawfully upon the

highway, walking upon the right side thereof in longitudinally passing over it, without being chargeable with contributory negligence, does that immunity cease when he momentarily halts and stands still?

"The mere fact that a person was standing momentarily in the street or highway does not of itself necessarily show contributory negligence as a matter of law, as he may assume that the motorist will not without warning run him down; and the fact that a person in the street is not in motion does not relieve motorists of all duty to use due care under the circumstances.

"Thus a pedestrian struck by an automobile is not guilty of contributory negligence because at the time of the accident he was standing in the roadway, conversing with one who had there stopped his team to talk with him, or was standing on a safety zone platform, or was standing for a few minutes on the pavement with one foot on the curb, or was awaiting the passage of a car, or was standing in the gutter, or a store owner standing on the pavement, or one stopping in a public way near the sidewalk to speak to one who is standing on the sidewalk." 2 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.) sec. 1395.

See, also, 1 Berry, Automobiles (6th ed.) 363.

"One is not necessarily guilty of contributory negligence because he is standing in the street when he is struck by a motor vehicle. When one is lawfully standing in the street, and no obstacle intervenes between such person and the driver of an approaching automobile, the duty is imposed on the driver to avoid a collision and not run down the foot traveler. While such a person cannot be entirely oblivious to his surroundings, he is not necessarily guilty of negligence because he does not look or see or hear the approaching machine." 5-6 Huddy, Automobile Law (9th ed.) sec. 101.

"Where a person is standing still in the street and does not observe the approach of an automobile, it is the duty of the driver to turn out so as to avoid striking him. Especially is this so, where there is ample room for the auto driver to

pass the pedestrian in safety, or where the car turns toward the pedestrian. He is not permitted to run him down and then claim that such pedestrian was guilty of contributory negligence in not seeing and avoiding the automobile. The same obligation is upon the driver, although the pedestrian is aware of the approach of the car." 5-6 Huddy, Automobile Law (9th ed.) sec. 4.

It is obvious that when the plaintiff traveling longitudinally in his car parked the same, opened the left-side door, got out of the car and stood beside it with one hand upon the handle of the door, his legal position was no worse than if he had walked longitudinally down the street and momentarily paused in the place he was then standing. He had not commenced the crossing of the street, and had no present intention of so doing until it was "cleared." Allowing a frontage of 24 inches for plaintiff as he then stood, 5 feet, 8 inches for the width of his automobile, beside which he was standing, and six inches for the distance from his automobile to the curb line, we find the space occupied to be 8 feet, 2 inches. This allowed an unobstructed clearance of 8 feet, 7 inches between plaintiff and the center street line, and deducting 6 feet 2 inches for the cars parked on the east side of the street, afforded a free, open, unoccupied space of at least 19 feet, 2 inches for the two cars to pass simultaneously in the center of the street. This was an ample clearance had the driver of the offending car driven with due care.

Truly, the plaintiff was fairly within the scope of this doctrine, viz.: "Certainly he had no reason to suppose that, merely because he was standing in the roadway, he would be run down by the recklessness of the driver of an automobile. He was lawfully there, and any person using the highway was bound to take notice of him, and to use care not to injure him, and the plaintiff had a right to assume that this would be done." 5-6 Huddy, Automobile Law (9th ed.) note under section 101 at page 174.

See, also, *Mezzi v. Taylor*, 99 Conn. 1, 120 Atl. 871; *Wellington v. Reynolds*, 177 Ind. 49, 97 N. E. 155; *Fong Lin v.*

*Probert,* 50 Cal. App. 339, 195 Pac. 437; *Martin v. Zatarain,* 7 La. App. 629; *Hershkowitz v. Moton Realty Co.,* 194 N. Y. Supp. 806; *Arnaz v. Forbes,* 51 Cal. 665, 197 Pac. 364; *Melville v. Rollwage,* 171 Ky. 607, 188 S. W. 638; *Smith v. Spirek,* 196 Ia. 1328, 195 N. W. 736; *White v. Edwards,* 222 Mich. 321, 192 N. W. 560; *Millay v. Town Taxi, Inc.,* 242 Mass. 314, 136 N. E. 127.

In Babbitt, Motor Vehicle Law (4th ed.), secs. 1814 and 1816, the principles applicable to the issues in the present case are stated as follows:

(Section 1814) "The driver of an automobile is bound to keep a watch for and avoid persons standing near standing vehicles, and it is not negligence for the pedestrian to stand thus on the street side of a standing vehicle. Where there is ample room for the driver to pass, it is negligence for him to run over such a pedestrian, even though the latter heard the automobile approaching. So, the driver of a vehicle who attempts to pass such a person standing beside a standing vehicle, without slowing down and without considering how he can pass, is negligent."

See, also, *Shea v. Hemming,* 97 Conn. 149, 115 Atl. 686; *Williams v. Schmidt,* 213 Ky. 122, 280 S. W. 494; *Myers v. Kennedy,* 306 Mo. 268, 267 S. W. 810; *Cooper v. Agee,* 222 Ala. 334, 132 So. 173; *Walden v. Stone,* 223 S. W. (Mo. App.) 136; *Strachan & Son v. Illinois Brick Teaming Co.,* 263 Ill. App. 481; *Coffman v. Singh,* 49 Cal. App. 342, 193 Pac. 259.

(Section 1816) "The fact that a pedestrian stops momentarily and stands still in the highway does not render him *per se* guilty of contributory negligence, and the driver is not thereby exonerated from all duty and liability by the fact that he is not in motion. Such a pedestrian has the same rights in the highway as a driver injuring him, and a driver having ample time and opportunity to avoid a collision with a pedestrian standing on the highway is negligent, if he fails to do so."

See, *Murphy v. Adams,* 99 Conn. 632, 122 Atl. 398; *Millay v. Town Taxi, Inc., supra; White v. Edwards, supra; Lustik*

*v. Walters,* 169 Minn. 313, 211 N. W. 311; *Green v. Bohm,* 65 Mont. 399, 211 Pac. 320; *Martin v. Zatarain, supra; Henkel & Sullivan v. Robinson,* 27 Ohio App. 341, 161 N. E. 342; *Stotts v. Taylor,* 130 Kan. 158, 285 Pac. 571.

Due consideration of all the facts reflected by the evidence in this case, in the light of the principles established by the authorities cited, leads to the inevitable conclusion that at the time of the accident the plaintiff was lawfully on the pavement where he was standing, and his position and presence were clearly open to the view of the approaching cars. He had a right to rely on reasonable care on part of automobile drivers thereof. Any person using the highway was bound to take notice of him and to use care not to injure him, and plaintiff had a right to assume that this would be done. When in that position, after alighting from his automobile, he looked to the northward and observed an approaching car apparently traveling in the center of the street but so far away that he could not judge its speed, and then turned to the south and, for a brief period of four or five seconds, observed an approaching car from that direction but nearer at hand, when he was struck by the automobile he had first seen, which in the meantime rapidly and silently had bore down upon him without sounding horn or giving other alarm, it cannot be said that the injured party was guilty of contributory negligence as a matter of law.

It follows that in sustaining the defendant's motion for judgment, made at the close of plaintiff's evidence in chief, the district court erred. Its judgment is, therefore, reversed and the cause remanded for further proceedings in harmony with this opinion.

REVERSED.