KATHERINE NICHOLS, SPECIAL ADMINISTRATRIX, APPELLEE, V. LUMIR HAVLAT, APPELLANT.

1 N. W. (2d) 829

FILED JANUARY 9, 1942.   No. 31188.

*Brown, Crossman, West, Barton & Fitch,* for appellant.

*Boyle & Boyle, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, MESSMORE and YEAGER, JJ., and FALLOON and ELLIS, District Judges.

EBERLY, J.

This is an action for damages because of the death of George Nichols, 63 years of age, prosecuted by Katherine Nichols, his widow, as special administratrix of his estate, against Lumir Havlat. Nichols was struck and killed by defendant's truck, then being operated under defendant's direction and control, on the night of April 17, 1940, west of the city limits of Omaha, while decedent, as a pedestrian, was proceeding on and along an arterial highway known as the Q street highway. From a verdict for plaintiff in the sum of $7,000, and judgment entered thereon, and the order of the trial court overruling his motion for a new trial, the defendant appeals.

"Q street" highway, so far as involved in the accident, is comparatively straight, extending from west to east. The traveled portion thereof is paved with brick, with an 8-inch cement shoulder on either side thereof, and these together make up a roadway 18 feet in width. The road-bed is substantially level, with a slope to the west, not excessive but gradual. No permanent natural objects interfere with the view of the traveler passing over the same. On the night of April 17, 1940, the defendant was engaged in transporting 375 bushels of corn in his 1939 Chevrolet truck, with an Omaha standard trailer attached thereto, to the town of Dorchester, Nebraska. The truck, trailer, and contents weighed approximately 31,080 pounds. The defendant had crossed the Omaha bridge, and about 10 o'clock he was approaching the intersection of Sixtieth street and Q street. The night was dark but clear; the pavement was dry. There is no evidence that atmospheric conditions were other than normal. As they approached the Sixtieth street intersection the defendant was asleep alongside the driver

in the driver's cab, and evidently continued in that condition until after the occurrence of the accident. His employee, Lumir Belohlavy, was at the wheel and in full charge of the operation of the truck. As this driver was crossing the intersection of Sixtieth street with Q street the lights of an oncoming car from the west blinded him. Thereafter he was unable to discern objects on the paved portion of the highway for a distance of approximately 450 feet until he came abreast of the approaching car with the dazzling lights. Then for the first time he discovered the presence of some object on the right or north half of the pavement approximately in the center of the north lane, about two feet ahead and directly in front of him. His unchallenged testimony is: "Q. 'Question—So that you now tell the court and jury that as you crossed 60th street going west you were blinded by the lights of this intermediate car that you couldn't see anything until after those lights passed you, is that right?' To which you answered: 'After they came abreast of me; yes.'" This witness further testified: "Q. How far do you tell us now you were west of 60th and Q when your truck struck Mr. Nichols? A. About a block and a half. * * * Q. Did you see Mr. Nichols before you hit him? A. No. Q. Never saw him at all, did you? * * * A. No. I didn't. * * * I didn't see him, no, until he was in front of me. Q. Did you see him then? A. I saw something; yes. Q. Did you know what it was? A. No. Q. And how far do you think this something was in front of you when you claim you put your brakes on? A. I would say about two or three feet ahead of me. Q. Well, what is it, two feet? A. About two feet; yes. Q. Now, that's downgrade there, isn't it, as you go west from 60th and Q? A. Yes. * * * Q. And it was downgrade all the way until you hit this something, wasn't it? A. Yes. Q. What speed do you think your truck was traveling at the time you saw this something? A. Oh, between twenty-five and thirty miles an hour. * * * Q. And do you tell us with the car going twenty-five to thirty miles an hour and you see something two feet ahead of you, and

you had your foot on the brake before you hit that something, is that it? A. Yes; I have two levers to the brakes. * * * Q. After you hit this something, wasn't it? A. Before I hit it. Q. You hadn't applied the brakes until you saw this something, had you? A. No. Q. After you passed 60th and Q? A. No. Q. You had lights on your truck, did you? A. Yes. Q. How far would you say they would shine down the road? A. The lights I had on at the time would shine a hundred feet ahead. Q. Would you say a hundred to one hundred and twenty-five? A. Somewhere in that distance. I don't know exactly. * * * Q. Isn't that what you testified to at the inquest and at the last trial? A. Yes; I did. Q. One hundred to one hundred and twenty-five feet? A. Yes. * * * Q. Did you afterwards see what you had hit? A. After I hit it, you mean? Yes. Q. And what was it that you hit? A. I hit a man in the road. * * * Q. Wasn't it George Nichols? A. Yes."

And on cross-examination this witness testified: "Q. Now, then, as you traveled west from 60th you were meeting this car that was coming towards you, weren't you? A. Yes. Q. And that was the car that interfered with your vision? A. Yes; that's the one. Q. And how soon after this car passed you did the object loom up in the road in front of you, this Mr. Nichols? A. Just as I come abreast with this car. Q. And that was the first time you had seen Mr. Nichols? A. That was the first time. Q. And what did you do as soon as you saw him? A. Well, I slammed on the brakes and swerved sharply to the left. * * * Q. Where was the object on the pavement when you first saw it? A. Well, it was in the center of the north lane. Q. And the north lane is the lane for traffic going west? A. Yes."

On redirect examination he testified: "Q. And you traveled a block and a half against these other lights, where you couldn't see anything except this light? A. That's right. Q. And when those lights passed you a block and a half west, four hundred and fifty feet under your measurement, you saw something in the road all at once, is that

right? A. Yes; that's right. Q. And you didn't know what it was, did you? A. No."

And on recross-examination: "Q. But what you mean to say is that you didn't see the man because of the lights of this other car blinding you? A. That's right."

As a result of the application of the brakes and the turning of the truck to the left at the moment of the collision with the deceased, as testified to by witness Belohlavy, the course of the truck was diverted from the north traffic lane into the south and then upon the south shoulder and finally overturned in what appears to be in the nature of a road ditch or borrow pit on the south of the paving. The application of the brakes also caused skid marks to appear on the paving. The north skid mark extended along the paving for the distance of 119 feet to the place it went off the paving. From this point to where the truck overturned, the evidence in the record is that the distance was 250 feet. Immediately after the accident Mr. Nichols' dead body was found with his head and shoulders on the north edge of the pavement, and his feet and the rest of his body were out on the pavement. The evidence further discloses that the deceased had a broken arm and that his neck was broken; that his legs were both broken below the knees and one of them above the knee, and he had sustained numerous internal injuries. There is evidence in the record that the truck was traveling from 43 to 50 miles an hour at the moment of impact; but for the purpose of this appeal the most favorable evidence to defendant's contention will be accepted as establishing the fact that the truck was then traveling from 25 to 30 miles an hour. No horn was blown from the truck at any time during the occurrence. It is also to be noted that the headlights with which this truck was equipped substantially failed to conform to the requirements of the Nebraska statutes (Comp. St. Supp. 1939, sec. 39-1176), and so far as disclosed by the record before us, the presence of this truck on our highways at the time of the accident was unlawful.

At the conclusion of all the evidence the trial court sus-

tained plaintiff's motion to withdraw all questions of fact
from the consideration of the jury, for the reason that the
evidence then adduced showed conclusively that defendant
was guilty of actionable negligence, and that it also estab-
lished the fact that the plaintiff's decedent was not guilty
of contributory negligence "as a matter of law or fact."
The cause was then submitted to the jury on the sole ques-
tion of the amount of damages sustained for which plaintiff
was entitled to recover. The appellant challenges the suffi-
ciency of the evidence as an entirety to sustain this action
of the trial court. In addition to his challenge to the in-
sufficiency of plaintiff's evidence, the defendant's conten-
tion in part rested upon the following evidence introduced
in his behalf: A witness testifies that about 10 o'clock he
was standing at the southwest corner of the intersection
of Sixtieth and Q streets waiting for the Ralston bus.
He there discovered the decedent walking along the north
half of Q street approaching from the east a block away.
The night was dark but he could see Nichols when there
was a car coming behind him. Along the north side of
the paved portion of the highway was a dirt shoulder. As
Nichols came walking along Q street to the west, "he was
off and on to the north side of the pavement; * * * he was
onto the pavement and then back onto the shoulder."
Nichols' presence on the north side of this highway operated
to interfere with the use thereof by two automobiles com-
ing from the east. One of the passing cars coming up be-
hind him skidded about ten yards and then came to a
stop. Nichols said something to the passing car, but wit-
ness could not definitely say what was said. Witness watched
Nichols as he crossed the intersection of Sixtieth and Q
streets, then about 20 feet from witness. Nichols stopped
in this intersection, looked at witness, and then continued
westward on the north half of the highway on the north
shoulder and north half of the paved portion thereof on to
the westward. He further testified: "Q. And describe to
the jury what he was doing with reference to going down
that highway up to the time you saw the bus pass him. A.

Well, as I said before, he was off and on the pavement, and was staggering, and just as the bus was coming up, *he stopped in the north half of the pavement* and was urinating, and as the bus passed him, well, that's the last I saw of him." (Italics supplied.)

Another of defendant's witnesses testified that he was driving a Stiles passenger bus from Ralston to South Omaha over the Q street road. As he was approaching the Sixtieth street intersection he discovered a pedestrian (Nichols) some 75 feet ahead of his bus. He further testified: "Q. What was he doing, Russell, when you saw him? A. He was urinating in the middle of the road. Q. And when did you see that he was doing the urinating? A. Approximately the time I drew abreast of him. Q. And which way was he facing at that time? A. Southeast. Q. And can you describe to the jury what actions he was taking or doing besides the urinating at that place? A. He was standing, at a staggering standstill, sort of maneuvering around in the middle of the road while he was urinating." And, on cross-examination: "Q. And as you came east there that night, driving that bus, and you were driving it east, of course, you had no trouble seeing Mr. Nichols out there, did you, with your lights? A. I did not; I saw him. * * * Q. And when you came up, he moved over to the north of the road, didn't he? A. He moved— Q. No. Did he move over to the north of the road? A. Not as I came up; no. Q. Before you went by him? A. Yes. * * * Q. He moved over to the north side of the road, over toward the north curb, didn't he? A. Yes. * * * Q. Of course, from the time that you passed Mr. Nichols going east up to the corner you didn't see him any more, did you? A. No. Q. The last time you did see him, however, he was going to the north side of the road, wasn't he, as you passed him? A. Yes. Q. That would be away from the center to the north side of the road? A. Yes. Q. That would be on the west lane, to the north? A. Yes." After witness arrived at the Sixtieth street intersection, defendant's truck passed him and his bus going west. The evidence also disclosed

that Nichols at the time of the accident was wearing dark blue clothing and a dark hat or cap. The uncontradicted evidence discloses that the color of his clothing did not merge with the colors of the pavement and he was easily discovered by automobiles approaching him both from the east and the west. Further, the evidence in the record discloses affirmatively that the accident was wholly due to the blinding headlights of an approaching car and was in no manner contributed to by the color of the clothing worn by the deceased.

The deceased came to his death while proceeding longitudinally westward on the north half of the paved portion of Q street. This jurisdiction is committed to the rule that pedestrians have the right to use the public street at any time day or night, and, in the absence of applicable statute or ordinance limiting the same, have the right to walk longitudinally in a street or highway, and are not, as a matter of law, guilty of contributory negligence in so doing. *Cotten v. Stolley,* 124 Neb. 855, 248 N. W. 384; *Brenning v. Remington,* 136 Neb. 883, 287 N. W. 776.

It is also an established doctrine in this state that a motorist who drives his automobile so fast on a highway at night that he cannot stop in time to avoid a collision with an object within an area lighted by his headlights is negligent as a matter of law. *Redwelski v. Omaha & C. B. Street R. Co.,* 137 Neb. 681, 290 N. W. 904; *Roth v. Blomquist,* 117 Neb. 444, 220 N. W. 572; *Cotten v. Stolley, supra; Most v. Cedar County,* 126 Neb. 54, 252 N. W. 465; *Hendren v. Hill,* 131 Neb. 163, 267 N. W. 340; *Fischer v. Megan,* 138 Neb. 420, 293 N. W. 287.

On principle it appears that the existence and presence of smoke, snow, fog, mist, blinding headlights, or other similar elements which materially impair or wholly destroy visibility, are not to be deemed intervening causes, but rather as conditions which impose upon the drivers of automobiles the duty to assure the safety of the public by the exercise of a degree of care commensurate with such surrounding circumstances. *Anderson v. Byrd,* 133 Neb. 483, 275 N. W. 825; *Fischer v. Megan, supra.*

Clearly, in the instant case the driver of this 31,080-pound truck and trailer, permitting it to cover this distance of 450 feet at the rate of 25 to 30 miles an hour, during which visibility to the front was wholly destroyed by the blinding headlights of an oncoming car, violated the rule of due care and the requirement that his motor vehicle, under conditions then obtaining, should not be driven so rapidly that it could not be stopped within the area rendered visible to him by his headlights. The accidental colliding with Nichols, first seen by this driver within two or three feet of his truck, at the instant the truck and trailer came abreast of the car with the blinding headlights, and out of the area of invisibility occasioned thereby, is legally attributable to the clear violation of the rule of safety repeatedly approved by this court, and constituted negligence as a matter of law.

This conclusion is in harmony with the principles announced in other jurisdictions. *Hammond v. Morrison,* 90 N. J. Law, 15, 100 Atl. 154; *Foster v. Cumberland County Power & Light Co.,* 116 Me. 184, 100 Atl. 833, L. R. A. 1917E, 1044; *Osbun v. DeYoung,* 99 N. J. Law, 204, 122 Atl. 809; *Devine v. Chester,* 7 N. J. Misc. 131, 144 Atl. 322; *Cordts v. Vanderbilt,* 7 N. J. Misc. 856, 147 Atl. 464; *Meads v. Deener,* 128 Cal. App. 328, 17 Pac. (2d) 198; *House v. Ryder,* 129 Me. 135, 150 Atl. 487; *Russell v. Szczawinski,* 268 Mich. 112, 255 N. W. 731; *Day v. Cunningham,* 125 Me. 328, 133 Atl. 855.

However, the defendant insists that the deceased was intoxicated and guilty of contributory negligence to such a degree that would prevent recovery, or at least constitute a question for the decision of a jury. It will be remembered that the "burden of proving contributory negligence, an affirmative defense, is upon the party pleading it, and must be established by a preponderance of the evidence." *Carlson v. Roberts,* 133 Neb. 166, 274 N. W. 473; *Cotten v. Stolley, supra.*

To establish that the deceased was intoxicated, two witnesses detail certain acts and conduct, including a "stagger-

ing about" in deceased's progress westward along Q street. It appears that there was an inquest held upon the dead body, but as to whether there was an autopsy with an examination of the stomach content, and the results thereof, the present record is silent. None of the witnesses testifying, however, expresses the opinion that the deceased was intoxicated when they observed him. This, if it existed, was competent evidence. 7 Ency. of Evidence, 701; 22 C. J. 599. It was witnesses called by the defendant who had this evidence, if it existed. Assuming, but not determining, that the evidence in the record would, if believed, establish as a fact, in the absence of countervailing proof, that Nichols at the time of his death was intoxicated, or under the influence of liquor, this fact, if it was in truth a fact, under the evidence in the record, does not become a matter of legal importance.

"It is neither axiomatic nor knowledge common to all that men when drinking are utterly reckless of their safety or insensible to their duty to protect themselves." 20 R. C. L. 129, sec. 107.

Intoxication itself would not prevent a recovery. Where intoxication is not a contributory cause of injury inflicted, the plaintiff may recover for all injuries he would have suffered if sober. *Chicago & N. W. R. Co. v. Drake,* 33 Ill. App. 114; *Ward v. Chicago, St. P., M. & O. R. Co.,* 85 Wis. 601, 55 N. W. 771; *Houston & T. C. R. Co. v. Reason,* 61 Tex. 613; *Meyer v. Pacific R.,* 40 Mo. 151.

In *Cotten v. Stolley, supra,* Day, J., discusses the questions substantially presented in the following language:

"Is the evidence in this case, which establishes that Alta Cotten was walking either upon the right-hand side of the pavement or upon the graveled shoulder to said pavement, proof of contributory negligence on her part? There is no presumption of contributory negligence in this case. In *Engel v. Chicago, B. & Q. R. Co.,* 111 Neb. 21, it was held: 'Where there is no eyewitness, no direct evidence of the accident causing the injury, the facts and circumstances may be proved by circumstantial evidence, and the pre-

sumption is raised by the instinct of self-preservation on behalf of the deceased that he was not guilty of contributory negligence, but was in the exercise of due care and caution for his own safety, unless the contrary is shown.' The rule applicable to this situation is stated by one authority as follows: 'Pedestrians have the right to use a public street at any time of day or night. * * * They have a legal right to travel in the street, * * * and the mere fact that one does so, does not render him guilty of contributory negligence as a matter of law.' 13 R. C. L. 291, sec. 242. In an annotation, 67 A. L. R. 109: 'The rule is generally recognized that, in the absence of applicable statute or ordinance, a pedestrian has the right to walk longitudinally in a street or highway, and is not, as a matter of law, guilty of contributory negligence in doing so.' In *Hatzakorzian v. Rucker-Fuller Desk Co.*, 197 Cal. 82, 41 A. L. R. 1027, it is held that the common-law rule that pedestrians have a right to travel anywhere upon a public highway has not been changed in California by the legislature. And again, in *Kofoid v. Beckner,* 70 Cal. App. 624, it was said: 'Notwithstanding the fact that the number of reckless drivers have rendered the paved portion of our highways a danger zone, pedestrians have a right to the use thereof, and are chargeable only with such ordinary and reasonable care for their own safety as a prudent person would ordinarily exercise.' In *Pixler v. Clemens,* 195 Ia. 529, it was held that it is not contributory negligence, as a matter of law, to walk along the side of the road. There is no statutory provision in this state restricting the use of the highway by a pedestrian, and while a pedestrian walking on the highway is bound to exercise reasonable and ordinary care for his safety, one who is walking either on the right-hand edge of the pavement or on the graveled shoulder adjacent thereto is not guilty of contributory negligence as a matter of law. In 42 C. J. 1146, the rule is stated as follows: 'In the absence of statutory restriction, a pedestrian traveling on a street or highway is not confined to the use of the sidewalk or footpath, but has a right to walk in the roadway, and is not

negligent as a matter of law in so doing. * * * A person walking in the roadway is bound to use ordinary care to discover approaching motor vehicles, and a failure so to do is negligence; but he is not as a matter of law negligent in failing to turn about constantly and repeatedly to observe the possible approach of vehicles from behind him, especially where there is ample room for an automobile to pass him.' There is no evidence of contributory negligence on the part of Alta Cotten, even if she were walking on the pavement in the line of traffic, as is contended."

These principles thus announced in *Cotten v. Stolley, supra,* were expressly approved and adhered to in *Brenning v. Remington, supra,* and are controlling in the instant case. There is no evidence or proof as to what the deceased was doing immediately prior to the impact. When last seen alive he was proceeding along the highway where he had a right to be. No presumptions of negligence will be indulged against him, and no evidence of his contributory negligence appears in the record. The burden of presenting this proof, of course, is imposed on the defendant.

It follows that the trial court committed no error in withdrawing from the jury consideration of the question of negligence of the defendant and of contributory negligence of plaintiff's decedent. The issue as to amount of damages allowed is not argued in the briefs. The action taken by the district court in the trial of this case involved no substantial error, and its judgment is

AFFIRMED.

YEAGER, J., dissenting.

A dissent on my part gives me no great pleasure since it brings me into sharp conflict with the majority opinion of my associates in whose ability, integrity and fairness I have profound faith and confidence. In cases where I am able to recognize that there is room for doubt on the matter of legal or factual interpretations and applications, I am usually willing to bow to and acquiesce in the will of the majority; also, I am prone not to insist too strenuously upon technical or precise refinement where I feel that the

ultimate conclusion in the particular case is the proper one. It is only in those situations wherein I have a firm conviction that disturbing violence has been done to an existing substantial principle of substantive or adjective law, or that a new and haunting rule in one or the other or both of these fields is sought to be established, or that a particular case is being determined conformable to an incorrect or inadequate reflection of facts, that I have a disposition to express my disagreement with the majority in an opinion.

I find myself unable to agree with the majority here since it is my firm conviction that the decision in this case strikes down with a single blow certain principles of law and procedure which have been considered basic and fundamental since the law concerning the use of public ways and public highways has become crystallized, and since juries have been the triers of the facts in negligence cases.

Let it be said here that I find no fault with the statement of the case or of the facts as set out in the majority opinion. The facts which I shall set out later on herein are not contradictory and are not meant to be contradictory of those set out in the majority opinion, but are set out only for the purpose of supporting, under the issues in this case, what I conceive to be the true, existing and sound theories and principles of the law.

No good purpose would be served by restating the case and the issues here. They are sufficiently and correctly set forth in the majority opinion. The first six paragraphs of the opinion contain a statement of the case, the issues, and a partial statement of the evidence, and these paragraphs are fully adopted herein.

As stated in the majority opinion: "At the conclusion of all the evidence the trial court sustained plaintiff's motion to withdraw all questions of fact from the consideration of the jury, for the reason that the evidence then adduced showed conclusively that defendant was guilty of actionable negligence, and that it also established the fact that the plaintiff's decedent was not guilty of contributory negligence 'as a matter of law or fact.' The cause was then submitted

to the jury on the sole question of the amount of damages sustained for which plaintiff was entitled to recover."

It is the contention of the appellant that this action of the trial court was not sustained by the evidence. The action of the trial court is sustained in the majority opinion. The substance and effect of this holding is that the defendant was guilty of actionable negligence as a matter of law, and also that as a matter of law the defendant offered and adduced no competent substantial evidence on the issue of contributory negligence tendered by the answer, such as would permit submission of this question to a jury.

For the purposes of this dissent we may agree that the record discloses actionable negligence on the part of the defendant, and we may agree further that in the absence of any evidence on the issue of contributory negligence the trial court would have been required to submit only the question of damages to the jury, but I cannot agree that there is no competent substantial evidence to support the claim that the deceased was at the time of the accident guilty of negligence which contributed in some degree to the happening of the accident. In expressing the view I take full cognizance of the rule that the burden of establishing contributory negligence rested on the defendant, and I find no fault with the rule.

Now, in affirmation of the defense of contributory negligence, what is disclosed by the bill of exceptions? In answer to this question let us first get a picture of the fixed surroundings and conditions, and the conditions on that night. The defendant's truck was traveling westward on Q street road, the main arterial highway for traffic leaving and entering South Omaha from the west. This is a country road and not a city street. At the point of the accident the road declines to the west, not sharply but in a considerable degree. The paving with its shoulders provides a paving width of about 18 feet. The highway is quite heavily traveled. Whether or not at the time of the accident the traffic was what might be called heavy is not made clear by the record, but certain it is that there was some traffic

going in both directions. It was in the nighttime, and it appears that the vehicles on the highway carried the usual and customary lighting facilities and that they were lighted. The defendant's truck was traveling westward and it was lighted, but probably with lights not sufficient to meet statutory requirements, and the deceased was traveling on foot in the same direction. Both were traveling on their right or north half of the paved portion of the highway. The manner of operation of the truck is described in the majority opinion and with that I find no fault. The manner in which the deceased was traveling and his movements are referred to and with this I find no fault, but I think a further statement is necessary to a proper approach to what I conceive to be the chief and most grievous fallacy in the majority opinion, that is, the evidence on the question of contributory negligence, or that evidence adduced by the defendant tending to show that at the time and place in question the deceased failed to exercise the ordinary and reasonable care for his own safety required of him by the law.

I call attention first to the testimony of Russell Meacham, a witness called by the defendant, the driver of a bus which was traveling eastward, which is as follows: "Q. Were you driving a Stiles passenger bus from Ralston to South Omaha about 10:00 o'clock the night of April 17th? A. Yes, sir. * * * Q. Well, now, Russell, as you came along that highway that night, driving east, before you got to 60th street did you see any one in the highway? A. Yes, sir. Q. Did you see a pedestrian in the highway? A. Yes, sir. * * * Q. How far west of the intersection of 60th and Q was the man standing in the highway? A. Approximately—this is all guessing, I can't say for sure— I imagine it was somewhere between one hundred and one hundred and twenty-five feet. Q. West of 60th? A. Yes, sir. Q. Now, what time of night was that? A. Fifteen minutes until 10:00, to be exact. Q. And how far were you from the pedestrian when you saw him? * * * A. Well, about seventy-five feet. Q. Did you then drive your bus on

up to the place where the man was standing in the highway? (Objection to this question sustained.) Q. What did you do then, Russell? A. After I saw the man? Q. Yes. A. I drove up to somewhere near abreast of him, sort of studying him as I drove up and passed him. * * * Q. What was he doing, Russell, when you saw him? A. He was urinating in the middle of the road. Q. And when did you see that he was doing the urinating? A. Approximately the time I drew abreast of him. Q. And which way was he facing at that time? A. Southeast. Q. And can you describe to the jury what actions he was taking or doing besides the urinating at that place? A. He was standing, at a staggering standstill, sort of maneuvering around in the middle of the road while he was urinating. * * * Q. Now, Russell, you say it was about a hundred and twenty-five feet from the intersection of 60th and Q? (Question not answered.) * * * Q. And he was in the act of urinating when you passed him? A. He was. Q. And where with reference to the center of the highway was he? A. Approximately in the middle of the highway. * * * Q. And did you know then who the accident had been between? A. I did. Q. And who was it? * * * A. It was between the truck driver and Mr. Nichols. * * * Q. What was the first thing that attracted your attention to Mr. Nichols on the highway as you came up toward him? * * * A. His being in the middle of the road was the first thing that attracted me, and, secondly, his staggering actions. * * * Q. Just what was he doing, just tell the jury what it was. (Objection sustained.) (Defendant's attorney): Let the record show that the witness Meacham would have testified, if he had been permitted, that the deceased, George Nichols, was staggering around in the highway, and that was what called his attention to him. * * * Q. Well, what did you do with reference to your automobile as you drew alongside of the deceased, before the accident, as you were coming toward him or coming up where you were passing him? A. I slowed down and then drove around him. Q. And he stayed right there in the road? A. He did. * * * Q. And as you came

east there that night, driving that bus, and you were driving it east, of course, you had no trouble seeing Mr. Nichols out there, did you, with your lights? A. I did not; I saw him. * * * Q. And when you came up, he moved over to the north of the road, didn't he? A. He moved— Q. No. Did he move over to the north of the road? A. Not as I came up; no. Q. Before you went by him? A. Yes. * * * Q. He moved over to the north side of the road, over toward the north curb, didn't he? A. Yes. * * * Q. Of course, from the time that you passed Mr. Nichols going east up to the corner you didn't see him any more, did you? A. No. Q. The last time you did see him, however, he was going to the north side of the road, wasn't he, as you passed him? A. Yes. Q. That would be away from the center to the north side of the road? A. Yes. Q. That would be on the west lane, to the north? A. Yes."

The next witness to whose testimony attention is called is William Malverd, also a defense witness. He testified in part as follows: "Q. Were you on the highway on Q street the night of April 17, 1940, about 10:00 o'clock? A. Yes, sir. Q. And where were you standing? A. In the southwest corner on 60th and Q. Q. And were you waiting for the Ralston bus? A. Yes, sir. Q. How long had you been standing there? A. About ten minutes. Q. Did you see any object or did you see Mr. Nichols any place on Q street while you were waiting there for that bus that night? A. Yes, sir. Q. And where did you see him first? A. Well, it was east of 60th. Q. About how far east of 60th? A. Oh, I don't hardly remember that, but— Q. Well, give us your best recollection. A. Around a block, I would say. Q. And how long had you waited for the bus? * * * A. About ten minutes. Q. And part of that time you had observed Mr. Nichols, had you? A. Yes, sir. * * * Q. And which way was he walking? A. West. * * * Q. Well, did you stand there on the corner of 60th and Q waiting for a bus? A. Yes, sir. * * * Q. And which way were you facing? A. Toward the north, and looking both ways now and then. * * * Q. And you had stood on that corner watching the

street and watching the objects on the street that were within your view? A. Yes, sir. Q. What kind of a night was it? A. Dark. * * * Q. Well, did you see Mr. Nichols? A. The only time I would see him was when there was a car coming from behind him. * * * Q. And what did he do then? * * * A. Well, he was off and on to the north side of the pavement. Q. And describe to the jury what you mean by that? A. Well, I would say he was staggering in a way. * * * Q. Now, where was he on the pavement and where was he off the pavement, as you have stated? A. You mean what part of the block? Q. Yes; that's right. A. Well, it was a short distance east of 60th. Q. And did you see any cars pass Mr. Nichols east of 60th? A. Yes, sir. Q. And what took place, just what did you see when these cars were passing him? A. Well, one in particular, I would say, skidded about ten yards and came to a stop. * * * Q. What did Nichols do with reference to these cars? A. Well, he said something to them, but I didn't really hear, I couldn't definitely say what he said. Q. Now, you have stated that he was sometimes on the pavement and sometimes off. Now, what do you mean by that? A. Well, just what I said; he was onto the pavement and then back onto the shoulder. Q. Now, did you watch him as he crossed 60th street. A. Yes, sir. Q. Describe to the court and jury what he was doing as he crossed 60th street? (Not answered.) * * * Q. How far were you from Mr. Nichols when he crossed 60th street? A. About the width of the pavement. Q. And about how far would that be? A. About twenty feet. Q. And tell the jury just what he did then as you saw it, describe his condition? * * * A. Well, he stopped and looked at me, and, as I said before, he was off and on the pavement as he walked down. Q. Did he go out onto the north shoulder and then back onto the pavement? A. Yes, sir. Q. Well, describe to the jury just what you observed as to his condition? * * * A. I saw him staggering off and on the pavement. * * * Q. Now, between 60th and 61st can you tell the jury about how far he traveled of that distance before the bus passed him? A. I would say between

a fourth and a third of the way. * * * Q. And describe to the jury what he was doing with reference to going down that highway up to the time you saw the bus pass him? A. Well, as I said before, he was off and on the pavement, and was staggering, and just as the bus was coming up, he stopped in the north half of the pavement and was urinating, and as the bus passed him, well, that's the last I saw of him. * * * Q. About how far off of the pavement would Mr. Nichols travel before he would go back onto the pavement? * * * Q. Well, all right, after he left 60th street going west? * * * A. Oh, I would say to the middle of the shoulder on the north. * * * Q. Mr. Nichols all the time was walking either on the north half of that highway or on the shoulder? A. Yes, sir. Q. Always on the north side all the time you saw him? A. Yes, sir. Q. You never saw him on the south half of that road? A. No, sir; I didn't. Q. You claim the last time you saw him was as the bus passed him? A. Yes, sir. Q. And at that time you say he was about half way in the north traffic lane that goes west? A. Yes, sir. * * * Q. Standing still? A. Yes, sir. Q. Then you never saw him again, did you, until after you saw him dead? A. That's right."

On the basis of this testimony, is there evidence of negligence on the part of the deceased which contributed to the accident which caused the death, or was the trial court and is this court required to say on the record that as a matter of law deceased was in the exercise of ordinary and reasonable care for his safety? The effect of the holding of the majority in truth is either directly that the deceased was in the exercise of ordinary and reasonable care for his own safety, and that there was no evidence of contributory negligence, or indirectly that we now have come to the point in Nebraska jurisprudence when the weighing of the evidence no longer falls within the exclusive province of the jury, but it now is a function and prerogative of the trial court to, up to some uncertain and undefined point or place, determine the sufficiency, not existence, of evidence of contributory negligence. In all earnestness and sin-

cerity I must state that I find each and both of them entirely unacceptable and as, I believe, definitely unsound and unwarranted.

Lest I be misunderstood I want to state that I make no contention that the defendant proved contributory negligence. I contend only that he adduced sufficient competent evidence of contributory negligence to require the submission of that question to a jury under proper instructions. If there had been a fair trial under proper instructions with this question submitted, and the question had been ruled on adversely to the defendant by the jury, there possibly could have been, on the record presented here, no just cause for complaint.

The question presented by this appeal is not answered by the proposition stated in the majority opinion that "This jurisdiction is committed to the rule that pedestrians have the right to use the public street at any time day or night, and, in the absence of applicable statute or ordinance limiting the same, have the right to walk longitudinally in a street or highway, and are not, as a matter of law, guilty of contributory negligence in so doing," which proposition finds confirmation in *Cotten v. Stolley*, 124 Neb. 855, 248 N. W. 384, and *Brenning v. Remington*, 136 Neb. 883, 287 N. W. 776. This is the rule, but of what assistance is it here? It is not contended that the deceased was, as a matter of law, guilty of contributory negligence.

In the majority opinion it is stated: "It will be remembered that the 'burden of proving contributory negligence, an affirmative defense, is upon the party pleading it, and must be established by a preponderance of the evidence.'" The cases of *Carlson v. Roberts*, 133 Neb. 166, 274 N. W. 473, and *Cotten v. Stolley, supra,* are cited. No fault is found with the rule here announced, but wherein does it apply in this case? As stated, contributory negligence is an affirmative defense and to be available as a defense it must be established by a preponderance of the evidence, but *preponderance* is not a question for the court, but exclusively for the jury.

Further, in the majority opinion this statement is found: "In *Cotten v. Stolley, supra,* Day, J., discusses the questions substantially presented in the following language:" With the statement that the case of *Cotten v. Stolley* presents substantially the same questions as are presented here I respectfully disagree in part. In that case the woman was pushing the baby carriage down the street and on the right side, as was her right, innocent of any untoward acts or conduct, and the accident occurred much as this one did. The court in that opinion did not practically exclude for the future the defense of contributory negligence in cases such as the one before us now. The court in that case made two significant pronouncements. The first is quoted from a former decision of this court in the following language: "Where there is no eyewitness, no direct evidence of the accident causing the injury, the facts and circumstances may be proved by circumstantial evidence, and the presumption is raised by the instinct of self-preservation on behalf of the deceased that he was not guilty of contributory negligence, but was in the exercise of due care and caution for his own safety, unless the contrary is shown." *Engel v. Chicago, B. & Q. R. Co.,* 111 Neb. 21, 195 N. W. 523. It becomes clear to me that nothing can be found in that case to sustain the action of the trial court in the case at bar. The presumption that contributory negligence does not exist obtains only until evidence to the contrary is adduced. Certainly, the court did not mean to say, *unless the contrary is shown conclusively, or as a matter of law.* It was never intended that the jury should be ousted of its function in such circumstances.

The second is a quotation from the case of *Kofoid v. Beckner,* 70 Cal. App. 624, 234 Pac. 113, and is as follows: "Notwithstanding the fact that the number of reckless drivers have rendered the paved portion of our highways a danger zone, pedestrians have a right to the use thereof, and are chargeable only with such ordinary and reasonable care for their own safety as a prudent person would ordinarily exercise." This pronouncement exacts that pedestrians

744

on highways shall exercise reasonable and ordinary care for their own safety. Of course, if there is an entire absence of competent evidence of a lack of reasonable and ordinary care there is no requirement, and should be none, that the question of contributory negligence should be submitted to the jury, but that is not the situation here. The undisputed evidence in this case points out that the deceased, at night on a heavily traveled highway, immediately before the accident, was staggering or walking unsteadily back and forth in a manner manifesting all outward evidences of extreme intoxication, from the north shoulder to or toward the center of the pavement directly in the path of westbound traffic, and that once he stopped near the center of the highway to respond to a call of nature. In the light of these undisputed facts I fail to see how this court could arrive at the conclusion that the deceased, as a matter of law, was not guilty of contributory negligence. Whether or not he was guilty of contributory negligence, whether or not he was in the exercise of reasonable and ordinary care for his own safety was a question patently for the jury to determine.

An adherence to the rules announced in this dissent would not imply a denial of recovery by plaintiff in this case. It would require only that the case should be submitted to a jury under proper instructions embodying the comparative negligence rule.

SIMMONS, C. J., and ELLIS, District Judge, concur in the dissent.