STATE, EX REL. WILLIAM H. WRIGHT, ATTORNEY GENERAL, APPELLEE, V. FREDERICK W. BARNEY, JUSTICE OF THE PEACE, ET AL., APPELLANTS.

276 N. W. 676

FILED DECEMBER 17, 1937. No. 30058.

*Richard F. Stout, C. J. Campbell* and *J. Jay Marx*, for appellants.

*Richard C. Hunter, Attorney General, Perry, Van Pelt & Marti, Norval Brothers, Albert Johnston, William Niklaus, Hall, Cline & Williams* and *Woods, Aitken & Aitken*, contra.

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

EBERLY, J.

This action was commenced in the district court for Lancaster county on November 19, 1936, by a "Petition for a Writ of Prohibition," in which the State of Nebraska, ex rel. William H. Wright, Attorney General, was plaintiff, and Frederick W. Barney, Justice of the Peace, and William R. Linch and Thomas P. Johnson were defendants. These defendants each separately demurred to the petition, which demurrers were by the trial court overruled. The defendants then separately answered in writing, their pleadings each being entitled "Answer * * * to petition and return to alternative writ of prohibition." To the defendants' pleadings the plaintiff replied by a general denial. The issues so formed came on to be heard in the

district court without the intervention of a jury, and the state introduced its evidence, at the close of which the defendants each moved the court orally for a dismissal of plaintiff's petition for the reason that the court had no jurisdiction to issue a writ of prohibition, and that the evidence presented was "wholly insufficient to support the writ." This motion was denied by the trial court. The defendants elected to offer no evidence in their behalf. Thereupon the district court entered findings generally in favor of plaintiff, and awarded a permanent writ of prohibition against the defendants as prayed. From the order of the trial court overruling their separate motions for new trial, defendants appeal.

The defendants failed to preserve the evidence adduced at the trial by a proper bill of exceptions duly allowed and settled by the district court, a fact which materially affects the scope of review on appeal.

It will be noted that, after the demurrers of the defendants were overruled, they each answered, and, upon issues joined, trial was had on the merits. As applicable to these facts, the rule approved in this jurisdiction is: "Where a party answers over after an adverse ruling on his motion or demurrer, and goes to trial on the merits of an issue he has elected to join, he waives the error, if any, in such ruling." *Worrall Grain Co. v. Johnson,* 83 Neb. 349, 119 N. W. 668. See, also, *Palmer v. Caywood,* 64 Neb. 372, 89 N. W. 1034; *Citizens State Bank v. Pence,* 59 Neb. 579, 81 N. W. 623; *Lederer v. Union Savings Bank,* 52 Neb. 133, 71 N. W. 954; *Buck v. Reed,* 27 Neb. 67, 42 N. W. 894.

So too, "Under the practice of this court, where the record contains no bill of exceptions and the pleadings are sufficient to support the judgment of the trial court, it will be affirmed." *McIntyre v. Mote,* 77 Neb. 418, 109 N. W. 763. See, also, *McDaniel v. McDaniel,* 131 Neb. 639, 269 N. W. 380.

For, "In the absence of a bill of exceptions, it will be presumed that an issue of fact raised by the pleadings received support from the evidence, and that such issue was

correctly determined." *Backes v. Schlick,* 82 Neb. 289, 117 N. W. 707. See, also, *Hayes v. Pilger,* 110 Neb. 609, 194 N. W. 727; *In re Estate of Raymond,* 128 Neb. 568, 259 N. W. 522.

In view of the restrictions embodied in the instant record, the first, and probably the controlling, question is as to the existence of the remedy afforded by the writ of prohibition, and the jurisdiction of the district courts of this state to administer the same. We here use the term "jurisdiction" as expressing the concept of legal power to interpret and administer the law in the premises.

Section 1, art. V of our Constitution, provides: "The judicial power of the state shall be vested in a supreme court, district courts," etc.

Section 2, art. V, includes: "The supreme court shall have jurisdiction in all cases relating to the revenue, civil cases in which the state is a party, mandamus, quo warranto, habeas corpus, and such appellate jurisdiction as may be provided by law."

Section 24, art. I of the Bill of Rights, provides: "The right to be heard in all civil cases in the court of last resort, by appeal, error, or otherwise, shall not be denied."

Section 9, art. V of the Constitution, provides: "The district courts shall have both chancery and common-law jurisdiction, and such other jurisdiction as the legislature may provide."

By the terms of these constitutional provisions, district courts were endowed alike with chancery and common-law jurisdiction. These terms "chancery" and "common-law" jurisdiction must be read in the light of their historical use and definition when incorporated as a part of the Constitution of 1875. Within their respective spheres each must be given identical force and effect.

In construing these constitutional provisions, in *State v. Nebraska State Bank,* 124 Neb. 449, 247 N. W. 31, it was announced, viz.: "This court is committed to the view that not only is equity jurisdiction conferred by the terms of the Constitution, but that, as thus conferred, it is beyond

the power of the legislature to limit or control; that while the legislature may grant to the district courts such other jurisdiction as it may deem proper, it cannot limit or take from such courts their broad and general jurisdiction which the Constitution has conferred upon them. *Lacey v. Zeigler,* 98 Neb. 380; *State v. State Bank of Minatare,* 123 Neb. 109; *Burnham v. Bennison,* 121 Neb. 291." See, also, *State v. Farmers State Bank,* 121 Neb. 532, 237 N. W. 857; *Hall v. Hall,* 123 Neb. 280, 242 N. W. 607.

It is obvious that the exclusive and preeminent nature of the equity jurisdiction conferred on the district courts by these constitutional provisions is equally true of the common-law jurisdiction likewise vested in the same tribunals.

And, we are also committed to the view: "It is an imperative duty of the judicial department of government to protect its jurisdiction at the boundaries of power fixed by the Constitution." *State v. State Bank of Minatare,* 123 Neb. 109, 242 N. W. 278. See, also, *State v. Mitchell State Bank,* 123 Neb. 120, 242 N. W. 283.

Consistent with these constitutional provisions, in 1879 the legislature of that year enacted the following: "The district courts shall have and exercise general, original and appellate jurisdiction in all matters, both civil and criminal, except where otherwise provided." Comp. St. 1929, sec. 27-302.

The territorial legislature of Nebraska had by an enactment under the title, "An Act to put into force in this territory the common law of England," approved March 16, 1855, provided "That so much of the common law of England as is applicable to and not inconsistent with the Constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, be and the same is adopted and declared to be law within said territory." I Complete Session Laws, 1855-1865, p. 144. This provision was reenacted by the territorial legislature of 1866. II Complete Session Laws, 1866-1877, p. 12.

The "organic law" thus referred to expressly provided that the legislative power of the territory shall extend to all rightful subjects of legislation, consistent with the Constitution of the United States and the provisions of this organic act, and provided for the organization of a territorial supreme court and territorial district courts; and also provided that the supreme court and district courts, respectively, shall possess chancery as well as common-law jurisdiction.

The state Constitution of 1866, by section 1, art. XI, directed: "And all laws now in force shall remain in force until altered, amended, or repealed by the legislature; Provided, wherever the word territory shall occur, it shall be construed to mean state, whenever it may be necessary, in order that such laws may conform to the state government."

In the Constitution of 1875 a similar provision continuing in force and effect legislation previously adopted forms a part of section 1, art. XVI thereof, and which in turn was carried into and forms a part of section 1, art. XVII of the Constitution as amended in 1920. Of the legislation thus so carefully preserved, a part thereof appears now as section 49-101, Comp. St. 1929, substantially unchanged except so far as alteration of terms was essential to conform to the fact of the adoption of state government.

The words of the enactment "common law of England," as construed by this court, refer "to that general system of law which prevails in England, and in most of the United States by derivation from England, as distinguished from the Roman or Civil law system." *Williams v. Miles,* 68 Neb. 463, 94 N. W. 705. See, also, *Meng v. Coffee,* 67 Neb. 500, 507, 93 N. W. 713; 12 C. J. 188.

One of the controlling questions now being considered is whether the common-law remedy of "prohibition" is embraced in our adopting statute as an integral part of our "common law."

As to the historical origin of this remedy under consideration, in High, Extraordinary Legal Remedies (3d

ed.) 707, it is stated: "The writ of prohibition is of very ancient origin, and it may be said to be as old as the common law itself. As indicating its early origin, it may be mentioned that Glanville, whose treatise, written about 1181, is the earliest known work upon English law, gives several forms of the writ as then in use."

In 8 Bacon, Abridgment of the Law, 206, the existence, use and purpose of the remedy of prohibition as defined by the common law of England from time immemorial is discussed in the following language:

"As all external jurisdiction, whether ecclesiastical or civil, is derived from the crown, and the administration of justice is committed to a great variety of courts, hence it hath been the care of the crown, that these courts keep within the limits and bounds of their several jurisdictions prescribed them by the laws and statutes of the realm. And for this purpose the writ of prohibition was (a) framed; which issues out of the superior courts of common law to restrain the inferior courts, whether such courts be temporal, ecclesiastical, maritime, military, etc., upon a suggestion that the cognizance of the matter belongs not to such courts. * * *

"The object of prohibitions in general is, the preservation of the right of the king's crown and courts, and the ease and quiet of the subject. For it is the wisdom and policy of the law, to suppose both best preserved when every thing runs in its right channel, according to the original jurisdiction of every court; for by the same reason that one court might be allowed to encroach, another might; which could produce nothing but confusion and disorder in the administration of justice."

It follows that the doctrine of "prohibition" not only involved the definition of a substantive right, but has at all times constituted an essential remedy of the common law of England, administered through and by its superior courts of the common law as part of their common-law jurisdiction.

It must also be conceded that the form and terms of our

statute enacting the "common law of England" are a valid and effective exercise of legislative power. 59 C. J. 610; *Richardson v. Kildow*, 116 Neb. 648, 218 N. W. 429; *Sheridan County v. Hand*, 114 Neb. 813, 210 N. W. 273; *State v. Moorhead*, 100 Neb. 298, 159 N. W. 412.

It follows that the result of the legislative adoption of the common law of England, in view of our applicable constitutional provisions, was, subject to the limitations in that act expressed, effective to adopt as part thereof the procedure of prohibition as it existed at common law, and vested our district courts with original jurisdiction to administer the same.

See, also, Comp. St. 1929, sec. 20-2225.

Indeed, in discussing this subject, as presented by practice arising in the several states of the Union under modern conditions, a recognized authority on the subject says: "The writ of prohibition may be defined as an extraordinary judicial writ, issuing out of a court of superior jurisdiction and directed to an inferior court, for the purpose of preventing the inferior tribunal from usurping a jurisdiction with which it is not legally vested. It is an original remedial writ, and is the remedy afforded by the common law to correct encroachments of jurisdiction by inferior courts, and is used to keep such courts within the limits and bounds prescribed for them by law. The object of the writ being to restrain subordinate judicial tribunals of every kind from exceeding their jurisdiction, its use in all proper cases should be upheld and encouraged, since it is of vital importance to the due administration of justice that every tribunal vested with judicial functions should be confined strictly to the exercise of those powers with which it has been by law entrusted." High, Extraordinary Legal Remedies (3d ed.) 705.

The generally accepted principles of construction applicable to our present situation seem to be: "The common law is in force in the various states of the Union, except in so far as it has been abolished by statute, as to the remedies for enforcing rights and redressing wrongs. And the

general rule is that an affirmative statute giving a remedy not known to the common law does not take away the common-law remedy." 12 C. J. 194.

It is the contention of appellants that, "Under original territorial act, the writ of certiorari (thereby authorized and provided for) was sufficiently broad to include the writ of prohibition and was the equivalent of such writ, but such writ was abolished under the Code Laws of 1857, 1858, 1859." With this contention, we cannot agree. Speaking generally such is not the effect of the adoption of the Civil Codes. "The Code provides that there shall be but one form of action which shall be denominated a civil action. This provision has not changed the substantive rights of the parties. The substance of the common-law rules of legal procedure, and the principles by which the different forms of actions were previously governed, still remain as before. As it has been said, the abolition of the common-law names has not and cannot change the essential character of judicial remedies. And the common-law names are still used in Code states for convenience." 24 Standard Encyclopedia of Procedure, 374. See, also, Comp. St. 1929, sections 20-101, 20-102, 20-103; *Milwaukee, L., H. & T. Co. v. Ela Co.*, 142 Wis. 424, 125 N. W. 903; *Hopkins v. Washington County*, 56 Neb. 596, 77 N. W. 53.

It is obvious that the rights secured by our legislative adoption of the common law of England were not substantially affected by the change of the form of procedure effected by the Codes; and if a change actually occurred it must arise from specific provisions incorporated in such Codes.

It is true, however, that by sections 545-552 of an act adopting certain parts of the Code of Iowa, enacted by the territorial legislature, and approved March 16, 1855, provisions were made for a writ of certiorari, and the practice thereunder regulated. I Complete Session Laws, 1855-1865, p. 39. On this same date, March 16, 1855, our act adopting the common law of England was likewise approved. I Complete Session Laws, 1855-1865, p. 144. It is also

true that this portion of the Iowa Code so adopted was carried into and incorporated in the Code of Nebraska, passed and approved February 13, 1857, as chapter XXXIV thereof. This chapter XXXIV was in turn wholly repealed by section 621 of the Code of Civil Procedure, passed and approved November 1, 1858.

We submit that even conceding arguendo the "broadness" of the certiorari provisions referred to, as claimed by appellants, their conclusions that thereby the writ of prohibition was abolished in Nebraska may not be sustained. Nowhere in these statutory enactments is the remedy by prohibition or by writ of prohibition referred to or abolished *eo nomine*. Nor is that the necessary effect of the statutory language involved. The new Code writ of certiorari, in so far as it differs from certiorari at common law, must be deemed a statutory remedy. *Sherwood v. Arnold,* 80 Mich. 270, 45 N. W. 134. While these statutory provisions were in force, and prior to repeal thereof in 1858, they were plainly within the general rule of statutory construction hereinbefore stated, viz.: "An affirmative statute giving a remedy not known to the common law does not take away the common-law remedy." 12 C. J. 194. Hence, the writ of prohibition was not abolished by the original enactment enlarging the scope of certiorari known at common law. For, it is also a maxim of the common law that "A statute made in the affirmative, without any negative, express or implied, does not take away the common law." 12 C. J. 187. See, also, Beale, Cardinal Rules of Legal Interpretation (2d ed.) 336.

But, as we have seen, all these statutory provisions contained in chapter XXXIV of the Nebraska Code adopted and approved February 13, 1857, were absolutely repealed without any further expression of legislative intent. The controlling rule of construction, after this complete repeal (again conceding arguendo appellants' contention as to the implications carried by the original enactment), is: "When a statute abrogating a rule or principle of the common law is repealed, the common-law principle or rule is *ipso*

*facto* revived, unless there is something to show a contrary intent on the part of the legislature." 12 C. J. 187. See, also, *Beavan v. Went,* 155 Ill. 592, 41 N. E. 91; *Baum v. Thoms,* 150 Ind. 378, 50 N. E. 357; 1 Lewis' Sutherland, Statutory Construction (2d ed.) 573.

It is obvious that the history of the enactment and repeal by the Nebraska legislature of the statutory provisions relative to the "writ of certiorari" in no manner supports the conclusion that the effect thereof is to abolish the writ of prohibition. Nor is this conclusion in any manner affected by section 49-302, Comp. St. 1929, which was first enacted by the legislature of this state by an act approved February 21, 1873. Gen. St. 1873, 1056, ch. 79.

Furthermore, the common-law writ of prohibition was wholly distinct from a writ of certiorari, both as to relief accomplished and theory on which the remedy was administered.

"The writ of prohibition (in modern practice) is an extraordinary writ, issued by a superior court to an inferior judicial tribunal to prevent the latter from exceeding its jurisdiction, either by prohibiting it from assuming jurisdiction in a matter over which it has no control, or from exceeding its legitimate powers in a matter of which it has jurisdiction. Prohibition differs from certiorari in that the normal function of the latter remedy is to review action already completed at the time of the issuance of the writ, while the writ of prohibition will not lie where the act complained of has been fully performed. Certiorari, moreover, is a continuation of the original proceeding, while prohibition is separate and distinct therefrom." 21 Standard Encyclopedia of Procedure, 801.

Prohibition is a preventive remedy rather than a corrective one. *Havemeyer v. Superior Court,* 84 Cal. 327, 389, 24 Pac. 121; *State v. Crosby,* 92 Minn. 176, 99 N. W. 636; *State v. Burckhartt,* 87 Mo. 533; *Thomson v. Tracy,* 60 N. Y. 31; *State v. Stackhouse,* 14 S. Car. 417.

A careful consideration of the statutory certiorari as embodied in the Nebraska legislation discloses that, to

what extent it may have been broadened, it ever remained to be applied as a corrective remedy, and was but a continuation of the original proceeding. Thus, it never occupied the field, or accomplished the purpose, of a writ of prohibition, and never, either expressly or by necessary implication, operated to abolish that writ as an available remedy at common law in a court of competent jurisdiction within this state.

While it is true, as we have seen, that section 1, art. V of our Constitution, provides that the judicial power of the state shall be vested in the tribunals therein named, and by section 2, art. V of the Constitution, the original jurisdiction of the supreme court as distinguished from its appellate jurisdiction is limited to "all cases relating to the revenue, civil cases in which the state is a party, mandamus, quo warranto, (and) habeas corpus," we are committed to the view that the limits of the constitutional jurisdiction thus conferred may not be increased or extended either by consent of parties or legislative enactment. *Bell v. Templin,* 26 Neb. 249, 41 N. W. 1093; *Edney v. Baum,* 70 Neb. 159, 97 N. W. 252; *State v. Hall,* 47 Neb. 579, 66 N. W. 642; *Larson v. Wegner,* 120 Neb. 449, 233 N. W. 253.

It must be conceded that the subject of "prohibition" is not, by the terms of the Constitution, expressly enumerated as one over which the supreme court has original jurisdiction. Therefore, original jurisdiction over this subject must be deemed vested in the district courts alone.

In this situation appellants cite *State v. Hall,* 47 Neb. 579, 66 N. W. 642, *State v. Troup,* 98 Neb. 333, 152 N. W. 748, and *State v. Fulton,* 118 Neb. 400, 225 N. W. 28.

The *Hall* case involved an original application for a writ of prohibition made in the supreme court, and the decision therein as to jurisdiction was limited to, viz.: "The Constitution has not conferred upon this (the supreme) court original jurisdiction to award a writ of prohibition as an independent remedy." This principle has no application to the instant case which was commenced in the district court.

In the *Troup* case, there is involved an original proceeding in mandamus to compel respondent to reinstate a case which had been by him dismissed. Obviously, the sole issue presented for decision was a question of mandamus. In addition, the dismissal complained of was completed and the case fully disposed of by Judge Troup when that proceeding was commenced, so that the situation presented was one to which prohibition at common law was wholly inapplicable.

In the *Fulton* case, there is presented an appeal from the allowance of a permanent writ of mandamus by judgment of the district court for Fillmore county. The subject of "prohibition" was neither presented by the issues, involved in, nor decided by the judgment appealed from.

It is plain, therefore, that the true doctrine announced by each of the three cases last referred to, in view of the issues involved therein, in no manner tends to support the position of appellants in the instant case, which is an original application for a writ of prohibition instituted in the district court for Lancaster county. That court was unquestionably possessed of ample powers to administer, in a proper case, the remedy which a writ of prohibition affords.

In the case now before us, among the material allegations of the amended petition and contained in the exhibits made a part thereof are the following:

The official capacity of the relator, and the respondent Barney as justice of the peace in Lancaster county, Nebraska; that Charles Carr, acting for and in conjunction with William R. Linch, purchased certain premium notes given for hail insurance to the Lincoln Hail Insurance Company of Lincoln, Nebraska; that upon these notes the respondents Linch and Johnson have filed, before said Barney as justice of the peace, about 1,800 actions against the makers thereof, all of whom were nonresidents of Lancaster county; that Charles Carr was collusively joined in each of these actions as defendant therein, and that service of summons upon each of the defendants who are non-

residents of Lancaster county is claimed to have been made by registered mail; that each of said notes is by its terms payable to the Lincoln Hail Insurance Company; that on the back of each of the 1,800 notes is written the name "Charles Carr," but no liability of Carr on the notes sued upon is set forth; that respondent Barney, justice of the peace, kept no dockets, and that none were kept of any of the 1,800 cases so filed in his court, which are described and referred to in the amended petition, and that the only record kept was upon envelopes which contained the files in each case of the 1,800 so commenced; that the answer day was fixed by the terms of the summons issued therein about the 9th day of September, 1936, and though special appearances were timely filed, no hearing was had prior to the 13th day of November, 1936, or more than seven weeks subsequent to the filing of the same; and that no continuances were ever taken by the parties to said litigation or by the attorneys representing them; that at the time said special appearances came on for argument the respondent Barney announced he was "argument proof," in effect stating that he would overrule the special appearances, right or wrong; that the defendant in said actions, Charles Carr, was not a *bona fide* defendant, but the plaintiffs in said actions and the defendant Charles Carr and the respondent herein, Barney, as justice of the peace, have colluded to deprive the defendants in said actions of their rights; that said Carr was a former vice-president of the Lincoln Hail Insurance Company, and a relative of the respondent Linch; that said Carr was represented by the same attorney in the action involving the receivership of the Lincoln Hail Insurance Company as was the respondent Linch; that in said receivership action the respondent Linch made the original offer and changed the offer in open court in relation to the purchase of the notes upon which the actions against the nonresident defendants were based; that the respondent Linch furnished the funds and was actually the purchaser of said notes at said receivership sale; that Carr was a straw man used by

Linch to perpetrate a fraud upon the makers of the notes; that the defense of the defendants, nonresident of Lancaster county in each of said cases to the merits, depended upon separate and distinct facts; that said defendants named as such in the 1,800 cases thus commenced resided in all and various parts of the state; that they were sued for a small amount in comparison with the expense necessary to defend said actions and to perfect an appeal and said defense and appeal would require an expenditure equal to the amount for which said defendants were sued; that an appeal to the district court in all of said cases in which special appearances were filed would clog and congest the courts of the state of Nebraska; that the acts of the respondent Barney in attempting to wrongfully exercise jurisdiction and in colluding with the respondents Linch and Johnson and the defendant Charles Carr would bring the courts of the state of Nebraska into disrepute, tend to the scandal and disgrace of the state of Nebraska and its judiciary department, and make it impossible to get a just and equitable determination of the actions pending before said respondent Barney.

Sections 21-1801, 21-1802, 21-1803 and 21-1804, Comp. St. 1929, are the controlling statutes applicable to the instant record in the justice court, and must be substantially complied with. The docket entries must be made by the justice as these statutes direct.

In *Bishop v. Lincoln Baseball Club,* 98 Neb. 558, 153 N. W. 586, Rose, J., in delivering the opinion of this court, says in part, concerning the practice in justice court: "The docket entry must be made at the time the judgment is rendered. Rev. St. 1913, sec. 8533. Judgments enforcing rights and authorizing the seizure of the property of litigants are not left to the uncertain memory of judicial officers or to memoranda prepared by them on loose papers. * * * The law does not recognize as a judicial record the unofficial minutes of a justice of the peace. *Beuerlein v. Hodges,* 10 N. Y. Supp. 505." See, also, *Muller v. Plue,* 45 Neb. 701, 64 N. W. 232.

In the case of *In re Estate of Green,* 102 Neb. 306, 167 N. W. 68, this court announced the following:

"Section 8406, Rev. St. 1913, providing that upon return day a justice of the peace may, without consent of parties, adjourn the trial for a period not exceeding eight days 'if the justice be actually engaged in other official business,' does not authorize the justice to make such adjournment at a time subsequent to the return day.

"An unauthorized continuance or adjournment of a case will oust a justice of the peace of jurisdiction to take any further action in it."

It clearly appearing from the allegations set forth in the petition, which in this proceeding must be accepted as fully supported by the evidence, that defendant Carr is not a real party in interest, and that there is no issuable controversy between Carr and the respondents Linch and Johnson, the rule announced by this court in *Platte Valley Irrigation District v. Bryan,* 130 Neb. 657, 266 N. W. 73, is applicable, viz.: "Where an action is brought and service had upon one defendant in the county where the petition is filed, the action cannot be said to be rightfully brought in the county so as to authorize issuance of summons to a second defendant in another county, where it develops that the plaintiff is unable to present an issuable controversy as to the first defendant, and has no reasonable basis for a cause of action against him, and where no issue of fact is presented to establish that such defendant has any substantial interest in the suit adverse to the plaintiff."

It is clear, therefore, that whatever jurisdiction may have been at one time acquired by Justice Barney, it has been wholly lost by his failure to conform to the applicable statutes.

Viewing the record in this case in its entirety, we are fully confirmed in the opinion that the facts involved amply justify and require the issuance of a permanent writ of prohibition, and that the action of the trial court in so doing is fully justified, and it is

AFFIRMED.