KATHERINE NICHOLS, SPECIAL ADMINISTRATRIX, APPELLEE,
v. LUMIR HAVLAT, APPELLANT.

7 N. W. (2d) 84

FILED DECEMBER 18, 1942. No. 31188.

[REDACTED]

*Brown, Crossman, West, Barton & Fitch,* for appellant.

*Boyle & Boyle, contra.*

*L. R. Doyle, amicus curiæ.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

PAINE, J.

This is an action by Katherine Nichols, widow, as special administratrix of the estate of George Nichols, deceased, against Lumir Havlat, for the death of George Nichols, who was killed when struck by the defendant's truck. The first time the case was tried to a jury in the district court they were unable to agree, and were discharged. The second trial occurred in October, 1940, and the jury returned a verdict for $7,000 in favor of the plaintiff, for which amount a judgment was entered. Defendant appealed.

This case was first argued to this court on September 19, 1941, and the opinion is found in 140 Neb. 723, 1 N. W. (2d) 829, which opinion was released January 9, 1942.

A very full and complete statement of the case and of the facts, including extensive quotations from the evidence, is set out in the first opinion, to which reference is hereby made. Before discussing the law, a brief synopsis of facts which are practically undisputed will be set out.

George Nichols, the husband of the plaintiff, was 63 years old when he was killed on April 17, 1940. He was a common laborer at the Armour packing house, but had been on a vacation for a few days. He lived at 3628 Y street, South Omaha, which was about two and a half miles from the place where he was killed. He left home that afternoon

about 3 o'clock, his family expecting that he would return for supper. When he did not return, the wife sent one of the children down three or four blocks from home to a couple of taverns to inquire if he was there, but he was not. His family could give no reason why he was out at the place where he was killed, on Q street near Sixty-first.

The defendant Havlat owned and operated a large farm Chevrolet truck, with a standard trailer attached, the two weighing about 31,000 pounds, and the truck was going west. It was loaded with 375 bushels of corn, which he was taking to Dorchester, where he lived. Havlat, the owner of the truck, was riding in it, and was sound asleep in the cab until after the accident, his truck being driven by his employee, Lumir Belohlavy.

The accident happened about 10 p. m., west of the city limits of Omaha, on an arterial highway known as Q street, the main highway into South Omaha from the west. The pavement is 18 feet in width, with a 10-foot cindered shoulder on each side of the brick. There was considerable traffic at this point on the night of the accident. The lights of oncoming cars blinded the driver of the truck, and he did not see Nichols until he was just a few feet ahead of him and directly in front. The driver made a sudden turn, and upset the truck and trailer in the ditch on the left side of the highway, but did not avoid hitting Nichols, who was killed.

Russell Meacham, a bus driver, driving a passenger bus east from Ralston to South Omaha over Q street, said that he saw Nichols standing on the highway about 125 feet west of the intersection of Sixtieth street and Q street, and as he turned out and passed him he was urinating approximately in the middle of the road. He was at a staggering stand-still, sort of maneuvering around, facing southeast. The last time Meacham saw him he was going towards the north side of the road. Within four or five seconds the bus stopped at Sixtieth and Q to take on a passenger, and the defendant's truck and trailer passed, and looking in his rear vision mirror he saw the tail-lights on the truck zigzag and turn a somersault. He immediately backed his bus

up a way and ran to the body of the deceased, which was on the highway. The truck was upside down in the ditch on the south side of the road. He remained at the place of the accident over 15 minutes. Nichols wore ·dark clothing, and there were no street lights along Q street at this place.

William Malverd testified that he was waiting for the bus at the corner of Sixtieth and Q. He first saw Nichols east of Sixtieth street on Q street, walking west towards him. It was a dark night. "A. The only time I would see him was when there was a car coming from behind him. * * * Q. And what did he do then? * * * A. Well, he was off and on to the north side of the pavement. Q. And describe to the jury what you mean by that? A. Well, I would say he was staggering in a way. * * * Q. Now, where was he on the pavement and where was he off the pavement, as you have stated? A. You mean what part of the block? Q. Yes, that's right. A. Well, it was a short distance east of 60th. Q. And did you see any cars pass Mr. Nichols east of 60th? A. Yes, sir. Q. And what took place, just what did you see when these cars were passing him? A. Well, one in particular, I would say, skidded about ten yards and came to a stop. * * * Q. What did Nichols do with reference to these cars? A. Well, he said something to them, but I didn't really hear, I couldn't definitely say what he said. * * * Q. How far were you from Mr. Nichols when he crossed 60th street? A. About the width of the pavement. Q. And about how far would that be? A. About twenty feet. Q. And tell the jury just what he did then as you saw it, describe his condition? * * * A. Well, he stopped and looked at me, and, as I said before, he was off and on the pavement as he walked down. Q. Did he go onto the north shoulder and then back onto the pavement? A. Yes, sir. Q. Well, describe to the jury just what you observed as to his condition. * * * A. I saw him staggering off and on the pavement. * * * Q. And describe to the jury what he was doing with reference to going down that highway up to the time you saw the bus pass

him? A. Well, as I said before, he was off and on the pavement, and was staggering, and just as the bus was coming up, he stopped in the north half of the pavement and was urinating, and as the bus passed him, well, that's the last I saw of him."

The witness testified that after Nichols was killed he went down there, and his legs and hips were on the pavement and his head and the top part of his body were over on the north shoulder.

An examination of the pleadings shows that the sixth paragraph of the amended answer reads as follows:

"Defendant further alleges that at the time of the collision between this defendant's truck and the deceased, the deceased was in an intoxicated condition, had been staggering around on the road in the presence of other vehicles, and that at the precise time of the collision between this defendant's truck and the decedent, the decedent was urinating on the pavement and was so intoxicated that he was staggering from place to place on the pavement, which circumstances made it impossible for this defendant's driver to have avoided a collision with the plaintiff's decedent.

"Defendant further alleges that the gross negligence of the plaintiff's decedent, as above set forth, was the sole and proximate cause of the injuries and death of plaintiff's decedent and that such gross negligence of plaintiff's decedent at said time and place is and was sufficient to bar any recovery herein to the plaintiff from this defendant."

Further, that instruction No. 1 tendered by the defendant and refused by the court reads as follows: "You are instructed that if you find from the evidence that the decedent George Nichols was under the influence of intoxicants or was intoxicated at the time of the collision and that said intoxication prevented him from exercising care for his own safety and protection and that he did not use ordinary care, then his failure to use such care contributed directly to his injury and your verdict will be for the defendant."

The plaintiff's amended reply is a general denial.

However, all question of the decedent's negligence was withdrawn from the jury, even though it was in the pleadings, and evidence relating to it covered many pages in the bill of exceptions. The trial judge, instead of beginning his instructions with a brief synopsis of the petition, amended answer and amended reply, to set out the claims made by each party as the reason why each should prevail, gave as instruction No. 1:

"In a case of this kind, when the defendant alleges that the plaintiff's decedent was guilty of contributory negligence, the burden is upon the defendant to establish such defense by a preponderance of the evidence.

"You are instructed, as a matter of law, that the defendant has failed to establish his defense of contributory negligence, and such defense is withdrawn from your consideration. You are further instructed that the defendant's own testimony in this case makes him liable as a matter of law, under the rules laid down in cases of this kind by the supreme court of the state of Nebraska. Therefore, you are instructed that the defendant is liable to the plaintiff in some amount, and you are hereby instructed to return a verdict in favor of the plaintiff and against the defendant in some amount. In determining the amount of the plaintiff's damages you will be guided by instructions 2 and 3 following."

The trial judge thereby decided that defendant was guilty of actionable negligence, and that plaintiff's decedent was not guilty of contributory negligence "as a matter of law or fact." This left as the only question submitted to the jury, how much in damages do you think the plaintiff is entitled to under the evidence?

It is contended by plaintiff that not one single witness said George Nichols was drunk. This may be true, but many testified to his uncertain course and his constant staggering.

Under the subject "Intoxication," as treated in Negligence in 38 Am. Jur. 883, sec. 203, it is said: "Voluntary intoxication does not relieve one from contributory negli-

gence, or serve to relax the requirement which is imposed upon a person to exercise due care for his own safety. * * * A person threatened with a peril caused by the negligence of another is bound to exercise his intelligence and activity in full measure to avoid injury therefrom, and if it appears that from voluntary drunkenness he has deprived himself of the capacity so to do and as a result has suffered an injury, he will be denied legal redress therefor on the ground of contributory negligence. Thus, where one, by reason of his own voluntary intoxication, exposes himself to danger, and receives injuries which he could, and by the exercise of ordinary prudence would, have avoided if sober, he is guilty of contributory negligence and cannot recover for such injuries. However, the plaintiff's voluntary intoxication is not negligence *per se,* and will not of itself prevent a recovery; hence, it is error to enter a nonsuit or give a binding instruction to find for the defendant for the reason merely that the plaintiff was intoxicated. Intoxication defeats a recovery by the plaintiff for negligence only in so far as it affects the care which he takes for his own safety. Thus, evidence of plaintiff's intoxication is admissible, not as establishing contributory negligence in itself unless it shows that the drunkenness was in such degree as to cause loss of control of the muscles and senses, but as a circumstance to be weighed by the jury in their determination of the issue whether or not the plaintiff exercised ordinary care for his own safety."

Let us examine a few statements from the courts of other states:

"Whether the plaintiff suddenly staggered out in front of the car, or was walking in front of the car, in the middle of the lane of traffic where he was struck, in such a condition as not to be able to realize the danger, he was guilty of contributory negligence." *Jackson v. Cook,* 176 So. (La. App.) 622.

"The fact that a person when injured was intoxicated is not in itself evidence of contributory negligence, but it is a circumstance to be considered in determining whether

his intoxication contributed to his injury. If it did, he cannot recover. If it did not, it will not excuse the defendant's negligence. Ordinarily, it is a matter to go to the jury." *Coakley v. Ajuria,* 209 Cal. 745, 290 Pac. 33.

"There can be no doubt of the rule that negligence may be inferred from circumstances, and while, as a matter of law, intoxication is not contributory negligence, or conclusive evidence of such negligence as will prevent a recovery, still such intoxication is evidence of negligence from which the jury are at liberty to infer such negligence as will bar the action, if the attendant facts so warrant." *Rhyner v. City of Menasha,* 107 Wis. 201, 83 N. W. 303.

"Pedestrian who, while intoxicated, on a dark, wet night, completely covered with dark clothing, entered arterial boulevard without looking other than to take one look before entering boulevard, held contributorily negligent, precluding recovery against motorist who struck him when he was about 20 feet from the curb." *Gibb v. Cleave,* 55 Pac. (2d) 938 (12 Cal. App. (2d) 468).

"A pedestrian who was walking on the highway in the country in the nighttime while under the influence of intoxicating liquor was required to exercise the same degree of care as that required of a sober person, as respects liability of motorist who struck and killed pedestrian." *Olstad v. Fahse,* 282 N. W. 694 (204 Minn. 118).

"Much of defendants' argument concerning plaintiff's case relates to the evidence of his intoxication at the time. The evidence about this was conflicting and its extent in affecting his conduct was for the jury to find." *Carr v. Orrill,* 86 N. H. 226, 166 Atl. 270.

In 10 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed. 1935) 366, sec. 6628, it is said: "The rule that the question of contributory negligence should be submitted to the jury where the evidence is conflicting has been applied in cases * * * where a person suddenly steps in front of a motor vehicle, or is injured at an intersection, or is struck while walking on public thoroughfare at night, or * * * where at the time he was struck the pedes-

trian was intoxicated, standing on the sidewalk or in the path of a truck."

In the 1941 pocket parts to this Blashfield Cyclopedia, referring to section 6628, it is said: "As previously mentioned in this section, the contributory negligence of an intoxicated person has been submitted to the jury, as has the question whether the pedestrian was in fact intoxicated or under the influence of liquor."

In the bill of exceptions we find a statement made to the jury by the court before argument, as follows: "The Court: Now, gentlemen, we have reached the conclusion of this case, and it is now up to the lawyers to argue it. Prior to this time a motion has been made by the plaintiff to withdraw from the jury consideration of all evidence except the amount of damages, for the reason that the testimony shows that the defendant, by his own testimony, was liable in this case, and that no evidence has been introduced to show that the plaintiff's decedent was guilty of any contributory negligence. Now this motion has been sustained by the Court, so the only question that will be submitted to this jury will be the amount of the damages, if any, of the plaintiff, that the plaintiff is entitled to recover. The argument will be limited to that phase of it, so I am just announcing that ruling, so that you will know why the evidence is not discussed except that phase, the amount of the plaintiff's damages, if any."

In our opinion, this ruling of the court and the written instructions to the same effect were erroneous. The evidence shows that the deceased had left his home in the afternoon and was expected to return for supper. When he did not, they sent to two taverns to find him. At 10 o'clock that night he was staggering along a road ouside the city limits, going farther away from home. Cars proceeding in orderly fashion along this road had to turn out to go around him, or slide their wheels to avoid hitting him. When a bus was approaching, he stopped near the middle of the road to respond to a call of nature, maneuvering unsteadily around while so occupied.

With this evidence, and much more to the same effect, the ruling of the district court that the deceased as a matter of law was not guilty of contributory negligence was clearly erroneous, and that issue should have been submitted to the jury under the usual instructions.

The former opinion of this court in this case, found in 140 Neb. 723, 1 N. W. (2d) 829, is hereby set aside in so far as it conflicts herewith.

In a personal injury action, where there is evidence tending to show contributory negligence on the part of plaintiff's decedent, that question should be submitted to the jury under the provisions of section 20-1151, Comp. St. 1929. See *Sgroi v. Yellow Cab & Baggage Co.,* 124 Neb. 525, 247 N. W. 355.

The judgment of the district court is hereby set aside and the cause remanded for a new trial in accordance herewith.

REVERSED.

EBERLY, J., dissenting.

I respectfully dissent from the conclusions stated in the opinion of the majority of this court, both as to law and fact.

The territorial legislature of 1855 passed an act entitled, "An Act to put into force in this territory the common law of England," which common law of England, under conditions stated therein, was then by that act expressly "adopted and declared to be law within said territory." 1 Complete Session Laws, 1855-1865, p. 144.

This language was reenacted and continued in force by the territorial legislature of 1866 as section 1, ch. VII of the Revised Statutes of 1866. In the General Statutes of 1873 it was continued without substantial change, there being substituted under legislative authority to conform to the fact of Nebraska's admission to the federal union the words, "Inconsistent with * * * the Constitution of this state, or with any law passed or to be passed by the legislature thereof," for the words, "Inconsistent * * * with the organic law of this territory, or with any law passed or to

be passed by the legislature of this territory." As thus changed this statute was reenacted as section 3697 of the Revised Statutes of Nebraska for 1913, and again as section 3085, Comp. St. 1922, and still again as section 49-101, Comp. St. 1929.

As to the effect of these various reenactments see *Pinn v. State,* 107 Neb. 417, 186 N. W. 544; *In re Estate of Berg,* 139 Neb. 99, 296 N. W. 460; *Munch v. Tusa,* 140 Neb. 457, 300 N. W. 385.

Valid statutes by use of appropriate language may enact or reenact definite laws, even though unwritten, by proper reference thereto, and such acts so framed shall have the same operation as if they had enacted all such laws in terms. *Tramp v. United States,* 86 Fed. (2d) 82; *State v. Moorhead,* 100 Neb. 298, 159 N. W. 412; *Sheridan County v. Hand,* 114 Neb. 813, 210 N. W. 273; *Richardson v. Kildow,* 116 Neb. 648, 218 N. W. 429; *In re Estate of Mathews,* 125 Neb. 737, 252 N. W. 210; *Kinkead v. Turgeon,* 74 Neb. 573, 580, 104 N. W. 1061, 109 N. W. 744; *Meng v. Coffee,* 67 Neb. 500, 93 N. W. 713; *Drummond Carriage Co. v. Mills,* 54 Neb. 417, 74 N. W. 966; *St. James Orphan Asylum v. Shelby,* 60 Neb. 796, 84 N. W. 273; *Brooks v. Kimball County,* 127 Neb. 645, 256 N. W. 501; *Roberts v. Rogers,* 129 Neb. 298, 261 N. W. 354; *Osterman v. Central Nebraska Public Power and Irrigation District,* 131 Neb. 356, 268 N. W. 334; *State v. Barney,* 133 Neb. 676, 276 N. W. 676; *Drainage District No. 1 v. Suburban Irrigation District,* 139 Neb. 460, 298 N. W. 131.

"Public statutes of a state are judicially recognized by all courts of that state." 31 C. J. S. 525, sec. 16.

This necessarily includes as being within the requirements of judicial notice the terms of the common law of England as thus enacted and reenacted, and particularly that part thereof pertaining to the law of highways and torts relating thereto so far as invoked by the facts in the instant case.

In this connection, the accepted rule appears to be that, "In ascertaining matters of fact or of law to be judicially

noticed, the judge may resort to, or obtain information from, any source of knowledge which he feels would be helpful." 31 C. J. S. 516, sec. 12.

It is quite obvious that the rule of our Civil Code relative to the proof of foreign laws, apparently twice adopted, that "the unwritten law of any other state or (foreign) government *may be proved* * * * by the books of reports of cases adjudged in their courts." (Italics supplied.) Sections 20-1293 and 20-1269, Comp. St. 1929, make books of English reports of cases adopted by the courts of England authoritative as a safe and proper source of judicial information as to the terms and interpretation of the English common law as lawfully adopted by our legislature and applicable in the instant case.

Our English common law was essentially composed of customs of the people, which, followed and observed from time immemorial, have by common consent crystallized into a rule of civil conduct. Thus, in Chaucer's (about 1340-1400) Canterbury Tales we have depicted a pilgrimage to the then ancient English Shrine by pilgrims representing the various social orders then existing. Some were equestrians. Some were pedestrians who carried staffs. All were pursuing their pilgrimage over a highway of immemorial antiquity which then and now continues to be properly described as a public road over which all persons have full right of way, walking, riding or driving. 13 Encyclopedia Brittanica (14th ed.) 792.

But, in addition, under the English common law it has long been determined that "A foot passenger is not bound to keep on the foot pavement; he has a right to walk in the carriage-way, and is entitled to the exercise of reasonable care on the part of persons driving carriages along it." Addison, Law of Torts (7th ed.) 631. See, also, Boss v. Litton, 5 C. & P. (Eng.) *407.

In 1842 the case of *Davies v. Mann*, 10 M. & W. (Eng.) 545, was decided. This interpretation of the English common law was made 13 years before our first legislative adoption of the common law of England, and was before

the legislators when that act was passed. The *Mann* case was determined under the practice that prevailed at common law, of which Morrissey, C. J., in *Morrison v. Scotts Bluff County*, 104 Neb. 254, 177 N. W. 158, says, in part: "At common law, contributory negligence on the part of plaintiff, no matter how slight, was an absolute bar to recovery." In this *Mann* case, the plaintiff having fettered the forefeet of a donkey belonging to him, turned it into a public highway where the donkey was grazing, when the defendant's wagon, with a team of three horses, coming at what the witnesses said was a smartish pace, ran against plaintiff's animal, knocked it down, and the wheels passing over the animal, it died soon after. A recovery by plaintiff was sustained, Parke B., stating: "Although the ass may have been wrongfully there, still the defendant was bound to go along the road at such a pace as would be likely to prevent mischief. Were this not so, a man might justify the driving over goods left on a public highway, or even over a man lying asleep there."

Even in our own jurisdiction, not only are the principles announced by the *Mann* case accorded full recognition, but the fact that they are applicable and controlling in cases similar to what is presented in the instant case must also be conceded.

Stating the substance of the opinion of a learned justice, we repeat the following: Many years ago the English cases summarized the law which rules this case as follows: If a man is lying drunk on the road another is not negligently to drive over him. If that happened the drunkenness would have made a man liable to injury but would not have occasioned the injury. Recoveries by such injured were therefore sustained at common law. These cases thus referred to are but proper applications of the principles laid down in the maxim, *causa proxima non remota spectatur*. This imposes on plaintiff the requirement that he must prove that the defendant's negligence was the proximate and not the remote cause of the damage. Clearly a defendant is not liable, if, although he was negligent, it was

the negligence of the plaintiff and not his own that caused the accident. All of the foregoing principles clearly constituted a part of the common law of England as it was adopted by the legislature of 1855, and, by virtue of that, reenactment by reference should be deemed in effect a statutory declaration of our own legislature and binding upon us as such a statute. Of course, the acceptance of this proposition in effect is a denial of defendant's claim of contributory negligence. However, the weight of authority generally sustains the foregoing principles and their binding force, irrespective of whether they are derived from the common law of England by formal legislation adopted, or due solely to judicial recognition of the same. The general rule is properly expressed in the following quotation: "On the other hand, conditions (remote causes) must not be confounded with proximate causes. The mere fact that a person or his property is in an improper position, when, if he had not been there, no damage would have been done to him, does not preclude him from recovering. Such circumstance is only a condition to the happening of the damage, not a cause of it. * * * The fact that the person or property was in the particular situation is not in contemplation of law a cause of the damage. A man may in the daytime fall asleep in the country highway, or leave his goods there, and recover for injury by another's driving carelessly over him or them; since, though the position occupied is a condition to the damage, the damage is not the natural result of the act." Bigelow, Elements of the Law of Torts (5th ed.) 340.

"In determining liability for a tortious injury, the law looks only to the act or omission from which the result follows in direct sequence without the intervention of a voluntary independent cause and declines to permit further investigation into the chain of events, and unless the act complained of is the proximate cause of the injury, there is no legal liability." 62 C. J. 1115.

One fundamental error of the majority opinion is its failure to distinguish "proximate cause" from "occasion" or "condition" created.

Even if we wrongfully assume that the lawful exercise of the right by Nichols to travel longitudinally over the highway on foot as disclosed in the instant case amounted to negligence, still this evidence would not sustain the majority opinion; for we are clearly committed to the rule: "Two acts (of negligence) of independent source are not concurrent in causing an injury, if one of them merely furnishes a condition by which such injury is made possible, and later such injury occurs through the efficient, self-acting and independent operation of the other." *Johnson v. Mallory*, 123 Neb. 706, 243 N. W. 872. See, also, *Bergendahl v. Rabeler*, 131 Neb. 538, 268 N. W. 459; *Wentink v. Traphagen*, 138 Neb. 41, 291 N. W. 884.

The evidence adduced on the trial of this case is set out at length in the original opinions filed in this case and reported in 140 Neb. 723, 1 N. W. (2d) 829, and also, in part, in the present majority opinion, and will not be repeated in this dissent.

"Q street" highway, so far as involved in this suit, is comparatively a straight road bordering the city of Omaha, extending from east to west. The traveled portion is paved with brick, and constructed with an 8-inch shoulder of cement on either side thereof; these together make up a roadway 18 feet in width. On this highway between its intersection with "60th" street and its intersection with "61st" street, and situated on the north side thereof, are seven buildings, four of which appear to be dwellings, and all of which face "Q street" and are approximately from 24 to 63 feet distant therefrom. No permanent sidewalks are constructed in front of these houses, and the only accommodation for foot passengers along this street is the grade upon which the paved highway rests, and along which a dirt shoulder parallels the paved portion of the traveled highway. South of this road at this point are no buildings, but the country is an open field devoted to agriculture. The road bed is substantially level, with a slope to the west, not excessive but gradual. On the night of the accident no permanent natural objects obscured the view of the traveler passing over it to the westward.

. On the night of April 17, 1940, at about 10 o'clock p. m., defendant Havlat was proceeding westward over this highway, engaged in transporting 375 bushels of corn in his 1939 Chevrolet truck, with an Omaha Standard trailer attached thereto, to the town of Dorchester, Nebraska. There is no evidence that the defendant, or his driver in actual charge of the conveyance, were familiar with the highway over which they were passing, or had ever passed that way before. The undisputed evidence is that, as these parties approached and passed over the Sixtieth street intersection with the street over which they were proceeding, the defendant, Lumir Havlat was asleep in the driver's cab of the truck, and his employee, Lumir Belohlavy, was at the wheel and in full charge of the operation of the truck. It appears that Havlat never awoke until the accident was entirely over. Belohlavy, defendant's alter ego, testified, in effect, that the truck and trailer combined, under his control, from the Sixtieth street intersection to the point of collision of the truck with the deceased, was proceeding at the rate of from 25 to 30 miles an hour; that as he passed over the Sixtieth street intersection he was totally blinded by the dazzling headlights of an approaching automobile, which condition of total blindness continued uninterruptedly until that approaching car was passed, a distance of 450 feet from the intersection where his blindness commenced. During that time he could see nothing. As the dazzling lights of the approaching car passed the truck and as he passed beyond the area of the dazzling light, in the middle of the north traffic lane of this highway two feet immediately in front of his truck was a living form, Mr. Nichols, who was thus discovered by Belohlavy for the first time, and in less than the twinkling of an eye was then run down and killed. The testimony of the driver of the truck is that, as soon as Mr. Nichols was seen, the brakes of the truck were "slammed on" and the truck swerved sharply to the left. Thereby the course of the truck was diverted from the north traffic lane into the south lane and from there onto the adjoining dirt shoulder of the high-

way, and though the brakes thereof were kept constantly applied, the truck was finally stopped by being overturned in what appears to be in the nature of a road ditch or a borrow pit south of the paved roadway. In its passage over the pavement, after the brakes were applied, skid marks were left by the truck tires. The north skid mark extended along the paved surface of this highway for a distance of 119 feet to the place where it left the pavement. The actual measurements made and testified to indicate that the truck and trailer continued from that point 250 feet to the place it was overturned. There is no dispute in the evidence that this upset occurred west of a manhole situated south of the roadway.

From the time the truck crossed the Sixtieth street intersection until after the deceased was collided with, the driver of the truck neither decreased the speed nor sounded an alarm, but the conveyance proceeded down grade at the rate of 25 to 30 miles an hour.

The following is the uncontradicted testimony of a witness duly qualified as an expert on the subject to which his testimony relates:

"Q. Do you mean, Sergeant, that if the average, ordinary individual was confronted with a sudden emergency, like the looming up of an object before him, that it would be three-quarters of a second before the mind could telegraph it to the feet, and the feet to put on and apply the brakes? A. That's right. Q. How far would a car travel in feet going twenty-five miles an hour, in three-quarters of a second? * * * A. Approximately twenty-eight feet. Q. How far would a car travel in feet before the average person could complete the reaction period, going at thirty miles an hour? * * * A. Thirty-one and a half feet."

It is obvious that these distances are to be considered in determining the distances in which defendant's driver could bring his truck to a full stop.

Belohlavy, defendant's driver, and alter ego, further testifies in substance, that the headlights of the truck were defective in that the range of their beams was limited from

100 to 125 feet. The statutory requirement then in force was that motor vehicles were required to be equipped with headlights which "under normal atmospheric conditions and on a level road produce a driving light sufficient to render clearly discernible a person two hundred feet ahead." Comp. St. Supp. 1939, sec. 39-1176. It thus appears that the area lighted by these defective headlights did not exceed 125 feet. The driver was driving this truck at such a rate of speed at the time of the accident that the distance of more than twice the range of his defective headlights was required in which to bring this vehicle to a complete stop.

We are committed to the view that a motorist who drives his automobile so fast on a highway at night that he cannot stop in time to avoid a collision with an .object within an area lighted by his headlights is negligent as a matter of law. *Redwelski v. Omaha & C. B. Street R. Co.*, 137 Neb. 681, 290 N. W. 904; *Roth v. Blomquist*, 117 Neb. 444, 220 N. W. 572; *Cotten v. Stolley*, 124 Neb. 855, 248 N. W. 384; *Most v. Cedar County*, 126 Neb. 54, 252 N. W. 465; *Hendren v. Hill*, 131 Neb. 163, 267 N. W. 340; *Fischer v. Megan*, 138 Neb. 420, 293 N. W. 287.

In this case, even the fact, if we assume *arguendo*, that plaintiff's intestate was negligent in passing along this highway in the manner disclosed by the record immediately prior to his death, still the utter gross negligence of defendant's driver in his management of defendant's truck in conducting it when its condition rendered it wholly incapable of being stopped within the range of its headlights for more than 450 feet over a city street while the driver was in a blinded condition and incapable of discerning persons and things upon the traveled portion thereof clearly brings this controversy within the rule announced by this court in *Carnes v. DeKlotz*, 137 Neb. 787, 291 N. W. 480, as follows:

"Although a person may have negligently exposed himself or his property to an injury, nevertheless, if the defendant, after discovering his exposed situation, negligent-

ly injures him *or is guilty of negligence in not discovering his dangerous position in time to avoid the injury,* and injury results because thereof, he may still recover." (Italics supplied.) See, also, *Wilfong v. Omaha & C. B. Street R. Co.,* 129 Neb. 600, 262 N. W. 537; *Omaha Street R. Co. v. Martin,* 48 Neb. 65, 66 N. W. 1007.

But the assumption of the plaintiff's negligence, just indulged *arguendo,* is wholly without warrant in the record, in view of the issues made and presented by the pleadings on which the case was tried and determined.

The defendant's charge of contributory negligence is limited to the sixth paragraph of his answer, where, after charging deceased was intoxicated, he further says, "that *at the precise time of the collision between this defendant's truck and the decedent,* the decedent was urinating on the pavement and was so intoxicated that he was staggering from place to place on the pavement, which circumstances made it impossible for this defendant's driver to have avoided a collision with plaintiff's decedent." (Italics supplied.)

The word "precise," as here employed by the pleader, is thus defined by Webster's New International Dictionary (2d ed.) : "a. Having determinate limitations; exactly or sharply defined or stated; definite; exact;" etc.

To the allegations of this paragraph of the answer the plaintiff filed his reply expressly denying the same.

It cannot be gainsaid that the question of contributory negligence must be determined on the basis of the issues thereon as made by the pleadings of the parties. The doctrine adhered to in this court is, without question, that, "Contributory negligence is an affirmative defense, and cannot be proved unless alleged in the pleadings." *Reed v. Chicago, B. & Q. R. Co.,* 98 Neb. 19, 151 N. W. 936. See, also, *Mercer v. Omaha & C. B. Street R. Co.,* 108 Neb. 532, 188 N. W. 296.

We have also announced as a rule of procedure:

"Plaintiff, in an action based on specific acts of negligence resulting in personal injuries, is not entitled as a

matter of right to prove entirely different acts of negligence during the trial without amending his petition or giving defendant an opportunity to plead or prepare a new defense." *Scharf v. Frontier County,* 113 Neb. 688, 204 N. W. 516.

As a corollary to the foregoing proposition, it naturally follows that, "Where defendant sets forth facts claimed to show contributory negligence on the part of plaintiff, his proof is confined to the particular facts alleged." 20 Standard Ency. of Procedure, 322.

We have likewise announced the rule that, "Contributory negligence as a defense must be proximate to plaintiff's injury in the same sense in which defendant's negligence must have been proximate to the injury giving rise to the cause of action." *McCulley v. Anderson,* 119 Neb. 105, 227 N. W. 321.

To prove the charges of intoxication, defendant produced the driver of the Ralston bus, who, at 9:45 p. m. on the night of the accident, was proceeding over the Ralston-Omaha road traveling eastward. His final evidence was that, when he first saw Nichols, the deceased, he was standing on the north half of the road urinating; that he was standing at a "staggering standstill, sort of maneuvering around the middle of the road" while he was urinating. This place where Nichols was urinating was about 125 feet from the Sixtieth street intersection; and further witness states that he never saw Nichols alive after he passed him in the Ralston bus, and that Nichols was still urinating at that time, facing southeastward.

Another of defendant's witnesses, standing at the southwest corner of Sixtieth and Q streets, first discovered the deceased approaching over Q street about a block east of witness' then position, coming from the east, and staggering off and on the pavement. These movements caused certain cars coming from the east to slow up, and caused one car to stop. Nichols spoke to the people in the car that stopped, but what was said by him is not known by this witness. As Nichols was crossing the Sixtieth street inter-

section he looked to this witness. This witness further testified: "Well, as I said before, he was off and on the pavement, and was staggering, and just as the bus was coming up, he stopped in the north half of the pavement and was urinating, and as the bus passed him, well, that's the last I saw of him."

Nichols is dead. He cannot explain or extenuate. He is charged by the defendant with being intoxicated. It was sought to be shown by establishing a visit by him to taverns (poor men's clubs) during the day of his death. The attempt was a failure. No witness testified to having seen Nichols take a drink of intoxicating liquor or enter or leave a place where intoxicating liquors were sold, nor was any liquor found upon his person after his death, or in his possession during the day the accident occurred. No evidence appears in the record as to detecting the odor of intoxicants on his breath or person while living, or on his corpse after his violent death. There was an entire absence of evidence tending to establish "thickness of tongue," incoherency of speech, or the maudlin voice which may accompany the intoxicated. No autopsy was performed after the death.

The writer of the majority opinion assumes that a man who staggers is a "drunk." Yet, on the argument of this case, our attention was called to medical authority which establishes that these symptoms established by the evidence in the record were incident to no less than 60 diseases, in addition to intoxication. Further, this learned author of the majority opinion, in his many years of active life, must have observed that men of the years of the deceased (sixty-three) not infrequently develop a natural weakness of the urinary tract which necessitates frequent and sometimes uncontrollable urination; and that when that function, due to surrounding circumstances, is repressed, it results in nervousness, shifting on the feet, and even contortions, the outward manifestations thereof being not dissimilar to what is depicted in the record before us.

But there is no allegation in defendant's answer or evi-

dence in the record that plaintiff's decedent staggered in the slightest degree after the act of urination, testified to by the defendant's witnesses, was completed. There is no evidence that defendant's truck collided with him during the continuance thereof. The precise allegations of defendant's answer, limited as they are, are in all respects substantially disproved. He may not successfully defend on claimed contributory negligence which is not pleaded in his answer and substantially established by his evidence. Facts in the record indisputably establish that on completion of the act of urination Nichols proceeded west on the north half of the highway more than a block (300 feet) when he was overtaken by the defendant's truck from the rear, run down and killed, while the defendant's driver was in an area of dazzling light, blinded by an approaching car's headlights, but running without diminished speed at from 25 to 30 miles an hour. This was clearly gross negligence as a matter of law.

Under these circumstances, Nichols, as a pedestrian, had an equal right to use the highway with all who passed over it whether traveling vehicular or otherwise. He had a right "to rely upon an assumption that drivers of automobiles will not violate the law of the road, or statutes regulating the operation of automobiles, and will observe the ordinary care required of them." 3 Cooley, Torts (4th ed.) 538. See, also, *Cotten v. Stolley*, 124 Neb. 855, 248 N. W. 384. Properly on the highway, Nichols had a right to assume that he would not be run into from behind, and was not obliged to leave the highway. *Tri-State Refining Co. v. Skaggs*, 223 Ky. 731, 4 S. W. (2d) 739. A pedestrian is not required, as a matter of law, to look back for approaching vehicles, and is not guilty of contributory negligence on failing so to do. 29 C. J. 658; *Raymond v. Hill*, 168 Cal. 473, 143 Pac. 743; *Undhejem v. Hastings*, 38 Minn. 485, 38 N. W. 488; *Wiel v. Wright*, 55 Hun, 611, 8 N. Y. Supp. 776; *Petrie v. E. A. Myers Co.*, 269 Pa. St. 134, 112 Atl. 240; *People v. Blandford*, 23 Porto Rico, 580; *Cotten v. Stolley, supra*; *Brenning v. Remington*, 136 Neb. 883, 287 N. W. 776.

It follows that every allegation of the defendant's answer relative to contributory negligence was disproved, and wholly unsupported by the evidence. Defendant was limited as to defense to the contributory negligence alleged by him. No disputed issue of fact was for the jury; the controlling facts were undisputed and afforded no basis for conflicting inference. As in *Cotten v. Stolley, supra,* the district court in the instant case rightfully withdrew the defense of contributory negligence from the consideration of the jury. Its action should be affirmed.

I am authorized to state that Rose and Messmore, JJ., join in this dissent.